UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

LUIS FELIPE CABREJA,

                    Plaintiff,

          -against-

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,

                    Defendant.

---

9/14/15

**REPORT & RECOMMENDATION**

14 Civ. 4658 (VSB)(MHD)

TO THE HONORABLE VERNON S. BRODERICK, U.S.D.J.:

Plaintiff Luis Felipe Cabreja brings this lawsuit under
section 205(g) of the Social Security Act ("the Act"), as
amended, 42 U.S.C. § 405(g), seeking judicial review of the
Acting Commissioner's decision denying his application for
Social Security disability benefits. He premises his disability
claim on physical and mental impairments arising primarily from
a work-related accident in November 2007.

Both parties have moved for judgment on the pleadings. Mr.
Cabreja seeks an order reversing the Acting Commissioner's

1

determination and remanding for a calculation of benefits or, in the alternative, an order of remand for further development of the record. The Acting Commissioner ("Commissioner") seeks affirmance of her final decision. For the reasons that follow, we recommend that the case be remanded for development of the record, as indicated below.

## BACKGROUND

### I. Procedural History

Mr. Cabreja filed for disability insurance benefits on September 18, 2011,[1] citing issues regarding his back and bladder, as well as depression, acid reflux, anxiety and high blood pressure. He indicated that at least some of these problems resulted from a work-related accident, which occurred on November 7, 2007. (Tr. 167, 182-93). The Social Security Administration ("SSA") denied his application on initial review on January 12, 2012. (Id. at 69-73). On January 30, 2012, plaintiff requested an administrative hearing to review the adverse determination. (Id. at 80-81).

---

[1] This date was provided both in the decision by the Administrative Law Judge (Tr. 16) and in the Commissioner's memorandum in support of her motion (Def.'s Mem. 1), although we note that the document memorializing plaintiff's initial application for disability benefits is itself dated October 17, 2011 and mentions only that "[o]n October 3, 2011, we talked with you and completed your application for SOCIAL SECURITY BENEFITS." (Tr. 149).

On November 8, 2012, Administrative Law Judge ("ALJ") Robert Gonzalez conducted a hearing, at which Mr. Cabreja was the only witness to testify. (Id. at 31-61). On January 17, 2013 the ALJ issued an opinion, determining that plaintiff was not disabled. (Id. at 10-30). Plaintiff then appealed to the Appeals Council, which proceeded to deny review on May 27, 2014, rendering the ALJ's decision final. (Id. at 1-6).

## II.  The Pertinent Record

### A. Plaintiff's Testimony at the Hearing and Submissions

Mr. Cabreja was born in the Dominican Republic in 1964. (Id. at 42). He was 48 years old at the time of the ALJ hearing. (Id.). His formal education ended after the tenth grade, and he apparently cannot speak English fluently.[2] (Id. at 34, 36-40, 168). Mr. Cabreja emigrated from the Dominican Republic to the United States in 1989, and became a United States citizen in 2009. (Id. at 36). At the time of the hearing before the ALJ, plaintiff was living with his brother. (Id. at 41).

Plaintiff reported that he had not worked since 2007, when

---

[2] The hearing before the ALJ on November 8, 2012 was conducted with the assistance of a Spanish-language interpreter. (Tr. 33).

he fell off a ladder. (Id. at 41, 362). He also said that since then he has relied on his worker's compensation benefits, which total $273.00 per week. (Id. at 41). Prior to the accident, plaintiff worked as a machine operator and a handyman. (Id. at 34, 44). As a machine operator from 1991 to February 2003, Mr. Cabreja testified, he was required to lift only small, light objects. (Id. at 35-36, 47-49, 168).[3] He also testified that he had the ability to sit in a chair or stand while performing that work. (Id. at 35, 49).

Beginning in August 2003, Mr. Cabreja worked as a maintenance helper or handyman for a nursing home. (Id. at 44, 168).[4] Plaintiff testified that he helped to remove and install air conditioners, paint walls and ceilings, change ceiling tiles, and repair vents, as well as assisted with electrical work. (Id. at 44-46).

Plaintiff averred that since he was injured, he has not been able to perform machine operating work because he cannot

---

[3] In an earlier work history report, plaintiff reported having lifted upwards of 50 pounds for his job as a machine operator. (Tr. 212). At the hearing, plaintiff clarified that this was a reference to "[t]he recyclable parts of the machine," which was "somebody else's job" to carry. (Id. at 49). In his decision, the ALJ acknowledged this discrepancy and ultimately determined "that claimant's testimony provides a more accurate description of the demands required by his past work." (Id. at 26).

[4] Although unexplored at the hearing, plaintiff apparently worked for a short time, in July 2003, in "House Keeping and Maintenance" for a construction company. (Tr. 168; see also id. at 209).

"bend over too much now." (Tr. 49-50). Plaintiff confirmed that bending over referred to bending at the waist and going down, which, he claimed "would tire his body down." (Id. at 50). According to Mr. Cabreja, he always had to bend over as a machine operator, "because every time that the machine finishes a piece, a part, you have to go into the machine, pick it up, then come back out [and] close the machine." (Id.).

Mr. Cabreja testified to having lower-back, hip, and right-knee pain. (Id. at 52). In plaintiff's temporary disability function report, dated November 1, 2011, he noted that, because of pain, he cannot pick up heavy objects, bend, kneel, squat, reach far, and stand up, walk, or sit for too long. (Id. at 186-87). However, he indicated that he was able to visit his parents daily, shop for food and other necessities, go to church once per week, and go to an English class twice weekly. (Id. at 185-86). On a daily basis, he reads, watches television, prays, and walks. (Id. at 186).

Mr. Cabreja testified that the only pain medication that he was currently taking, and had been using since 2009, was Hydrocodone[5] two to three times daily. (Id. at 50).[6] According to

---

[5]    Hydrocodone    is    an    opioid    pain    reliever.    HYDROCODONE, http://www.drugs.com/hydrocodone.html (last visited August 17, 2015).

5

plaintiff, the Hydrocodone alleviated his pain, although it bothered his stomach. (Id. at 51). Indeed, he had stopped taking the medicine sometime in 2010 after it caused his stomach to bleed. (Id. at 50-51, 55). However, despite this side effect, he resumed the medication after undergoing lumbar surgery on May 2, 2011. (Id. at 55, 221-22). Plaintiff added that he was currently taking medication to counteract the stomach-related side effects of the Hydrocodone. (Id. at 51).

Plaintiff confirmed that since 2007 he has had two surgeries: knee surgery in 2008 and lumbar surgery in 2011. (Tr. 55-56). Mr. Cabreja claimed that, likely from the lumbar surgery,[7] he "did get better a little, but not enough." (Id. at 53). Prior to the surgery, Mr. Cabreja testified, he would "lose control and fall down" -- a symptom that ceased after the

---

    [6] Despite plaintiff's testimony to this effect, plaintiff had apparently taken some other medications for his pain. (See, e.g., Tr. 51). This subject is further explored infra pp. 102-04.

    [7] The questioning at this point in the hearing is somewhat hard to follow in light of the medical record. In pertinent part, plaintiff stated that "I also feel pain in my right knee," after which the ALJ asked whether Dr. Matamoro was "treating you for the right knee." (Tr. 52). When plaintiff answered in the affirmative, the ALJ immediately asked if Dr. Matamoro "did the surgery in April of 2011" (id. at 53), seemingly referring to the knee surgery -- but, most likely, referring to the lumbar surgery.

    Neither of plaintiff's surgeries -- which indeed were both performed by Dr. Matamoro (see, e.g., id. at 221-22, 311) -- took place in April 2011. In fact, plaintiff's knee surgery was performed in March 2008. (Id. at 251-52, 311). However, there is one reference to the knee surgery in the record -- in a "Pre-Hearing Memorandum" sent by plaintiff's attorney to the ALJ on November 5, 2012 (id. at 213) -- which erroneously dated plaintiff's back surgery to "April 2011" instead of May 2011 (Id.). Accordingly, plaintiff was almost certainly testifying at this point in the hearing that, subsequent to the May 2011 lumbar surgery, he "did get better a little, but not enough." (Id. at 53).

surgery -- but that he still experiences pain. (Id.). Plaintiff also testified that following his accident in November 2007, but prior to his lumbar surgery, he had taken one plane ride, a direct three-hour flight to his father-in-law's funeral, which was in Moca, Dominican Republic. (Id. at 40-41, 59).

Plaintiff testified about the pain-management care he received from Dr. Eugene Liu, which included receiving epidural[8] and facet block[9] injections. (Id. at 54-55). Mr. Cabreja indicated in his testimony that the injections helped only temporarily, and that the pain would come back after approximately one month. (Id. at 54-55).

Mr. Cabreja also testified to experiencing symptoms of depression, but repeated that he had never sought therapy or medication because he did not have medical insurance and could not afford to pay for treatment. (Id. at 58-59). When asked whether he would seek treatment if he had insurance, plaintiff

---

[8] Epidural injections "involve[] making an injection in the same manner as for an epidural anesthetic (single shot versus continuous), substituting cortisone or one of its derivatives for the anesthetic agent. Pain relief is not immediate; however, after a few days, there is often an improvement in acute pain which relieves the muscle spasm accompanying disc disease. A few epidural steroid injections may be required to achieve maximum benefit from this technique." LUMBAR-TREATMENT, 7 Attorneys Medical Advisor § 71:201.

[9] "A cervical, thoracic or lumbar facet joint injection involves injecting a small amount of local anesthetic (numbing agent) and/or steroid medication, which can anesthetize the facet joints and block the pain." CERVICAL, THORACIC AND LUMBER FACET JOINT INJECTIONS, http://www.spine-health.com/treatment/injections/cervical-thoracic-and-lumbar-facet-joint-injections (last visited Aug. 17, 2015).

7

replied, "of course." (Id. at 59). Asked to describe his symptoms further, plaintiff answered, "I feel sad. And there are times when I think things." (Id.). Plaintiff's attorney explained at the hearing that plaintiff lacked any evidence that the depression resulted from his workplace injury; therefore, such treatment was not covered by his employer's worker's compensation policy. (Id. at 58).

During the hearing, the ALJ asked plaintiff a series of questions concerning his proficiency with the English language. (Id. at 36-40, 45-47, 53, 56-57). When asked how "good" his English was, Mr. Cabreja responded, "A little, level three in English." (Id. at 36).[10] In order to pass the citizenship exam, Mr. Cabreja was required to answer ten questions and write two sentences in English. (Id. at 37-38). In the 1990s, he took his New York State driver's license written test in Spanish. (Id. at 38). To prepare for his citizenship exam, plaintiff took an English class once per week in his town of residence, Sleepy Hollow, for approximately one year. (Id. at 38-40). He was able to walk to this class, which was one block from his house. (Id. at 40). At the time of the hearing, plaintiff was taking a different English class once per week in the neighboring town of

---

[10] There was no frame of reference given for this third level of English.

Tarrytown. (Id. at 56). Plaintiff was also able to walk to this class, which plaintiff stated was one block away from his house, or approximately "five to ten minutes" away. (Id.).

Mr. Cabreja did not have to speak English when he worked as a machine operator because his co-workers were Dominican and thus native Spanish speakers. (Id. at 47). However, he "tried to speak English only" at his maintenance job and stated that he was not always able to communicate in English, but he was at least able to understand it. (Id. at 45-46). The ALJ posed two hypotheticals regarding whether plaintiff could understand two different notes written in English: "Luis, I need a screwdriver on the third floor, can you bring it to me?" and "the toilet needs to be unclogged in room 304." (Id. at 47, 57). Plaintiff confirmed that he would be able to understand both. (Id.).[11] When asked whether he was able to comprehend an English television show, Mr. Cabreja answered, "Not much. But I understand." (Id. at 57). However, plaintiff indicated that he was not able to read a newspaper in English. (Id.).

---

[11] Mr. Cabreja indicated that he is able to speak in Spanish to one of his treating physicians, Dr. Mitamura. (Tr. 53). The record includes several examples of plaintiff attending other appointments with interpreters as well. (See, e.g., id. at 310 [Dr. Liu], 337 [Dr. Weinberger]).

B. Medical Record Overview

Mr. Cabreja's injuries, pain, and diagnoses varied over the course of the five-year period from 2007 to 2012. Immediately subsequent to his November 2007 injury, plaintiff appears to have complained only of his knee injury. (See, e.g., id. at 259-60, 273-74, 366-70). His complaints of back problems followed in 2008 and became the principal source of his pain and debilitation. (See, e.g., id. at 259-62). Despite showing some improvement over the course of the five years (see, e.g., id. at 219), toward the end of this period, in 2012, plaintiff's condition was noted to have worsened. (See, e.g., id. at 391-92).

Mr. Cabreja injured his right knee on November 7, 2007 after falling off a ladder at work. (Id. at 362-70). He was diagnosed with a tibial plateau fracture and had arthroscopic surgery in March 2008. (Id. at 251-52, 311). Mr. Cabreja's complaints of back pain were first documented in mid-2008,[12] and

---

[12] According to the notes of Dr. Paul Carton, who prepared a number of reports for the purpose of evaluating worker's compensation claims, while plaintiff claimed -- in July 2008 -- that he had been experiencing back pain since December 2007, Dr. Carton could not find evidence corroborating this discomfort dating to any earlier than May 2008. (See Tr. 259-60, 263-65). We note that, in Dr. Carton's August 5, 2008 report, he observed that "in March 2007 the claimant made reference to low back pain," but Dr. Carton was specifically writing about plaintiff's fall from the ladder, which did not

in June 2008 an MRI revealed that he had a herniated "nucleus pulposus[13] at L5-S1." (Id. at 253; see also 260, 311).[14]

From May 2009 through December 2010, Mr. Cabreja underwent six facet block injections and six steroid epidural injections (Id. at 281-83, 288-90, 295-98, 304-08) to inconsistent effect (id. at 280, 284, 287, 293-94, 307), although at the hearing before the ALJ, plaintiff generally recalled that the injections each provided about one month of relief from his pain. (Id. at 54). Additionally, Mr. Cabreja participated in physical therapy and took pain medication from 2008 through 2012. (See, e.g., id. at 263, 266, 278, 280, 286, 312, 380, 385). In May 2011, Mr. Cabreja had lumbar fusion surgery, after which he reportedly experienced some relief. (Id. at 221-22, 225). However, in December 2011, Mr. Cabreja's condition appeared to worsen, as Dr. Robert Simon diagnosed him with "failed back surgery syndrome" (id. at 372-76), and in July 2012, Dr. John Mitamura noted that Mr. Cabreja might need "revision surgery." (Id. at

---

occur until November 2007. (Id. at 261). We therefore surmise that this reference to a March 2007 record of back pain as erroneously dated.

[13] "Herniated nucleus pulposus is a condition in which part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain and nerve root irritation." HERNIATED NUCLEUS PULPOSUS, U.S. NAT'L LIBRARY OF MEDICINE, https://www.nlm.nih.gov/medlineplus/ency/imagepages/9700.htm (last visited Sept. 10, 2015).

[14] While the record does not contain a copy of the report of the June 2008 MRI of the lumbar spine, reference to it is made several times by various physicians. (Tr. 253, 260, 311).

11

391-92). Indeed, throughout Dr. Mitamura's 2012 medical reports, he indicates that Mr. Cabreja was experiencing back pain, having difficulty with mobility, and was disabled and unable to work. (Id. at 378-92).

### C. Medical Records: Treating Doctors

#### a. Phelps Memorial Hospital

On November 7, 2007, plaintiff went to Phelps Memorial Hospital's emergency room after his work-related accident. (Id. at 361-70). Mr. Cabreja was treated by Dr. Isaac Sapoznikow, whose notes say that plaintiff fell from a ladder at work, from about three feet above the ground and that his knee buckled. (Id. at 362, 364). Mr. Cabreja had a right-knee x-ray and CT scan of his right lower extremity, which revealed that he had a lateral tibial plateau fracture[15] and a suprapatellar[16] effusion[17]. (Id. at 369-70). Mr. Cabreja was given a three-day work restriction. (Id. at 367).

---

[15] "The 'tibial plateau' is the flattened upper surface of the tibia which meets (articulates with) the femur." 3 ATTORNEYS MEDICAL ADVISOR § 28:150.

[16] "Above the kneecap." 1 ATTORNEYS MEDICAL DESKBOOK § 5:21.

[17] "[S]welling." 7 ATTORNEYS MEDICAL ADVISOR § 68:53.

b. John A. Mitamura, M.D., Ph.D.

Dr. John A. Mitamura, a board certified orthopedic and spinal surgeon at Beacon Hill Orthopedics (Tr. 388), treated Mr. Cabreja more than ten times from March 14, 2008 through September 4, 2012. (Id. at 218-22, 237-38, 270-71, 378-92; see also id. at 251-52).[18]

i. Knee Injury and Pain

Following the diagnosis at Phelps Memorial Hospital on November 7, 2007 (id. at 362), Dr. Mitmamura performed arthroscopic surgery on Mr. Cabreja's knee on March 14, 2008. (See id. at 264). A January 2, 2009 MRI, ordered by Dr. Mitamura, revealed that the lateral tibial plateau fracture had

---

[18] These records reflect plaintiff's visits with Dr. Mitamura on the following dates (reordered chronologically): July 7, 2009 (id. at 270-71); May 2, 2011 (id. at 221-22); June 30, 2011 (id. at 238); August 2, 2011 (id. at 237); September 15, 2011 (id. at 219-20); October 19, 2011 (id. at 218); March 28, 2012 (id. at 391-92); June 21, 2012 (id. at 388); July 24, 2012 (id. at 383); September 4, 2012 (id. at 380). Dr. Mitamura quite obviously performed surgery on plaintiff's knee on March 14, 2008 (see id. at 252, 264), although an attendant report is not in the record.

Additionally, Dr. Carton's notes reflect the existence of numerous other appointments and records from Dr. Mitamura that are also not otherwise in the record (again reordered chronologically): November 13, November 20, November 28, December 5, and December 18, 2007 (id. at 267); January 2, March 12, March 25, and April 10, 2008 (id. at 264); May 6, 2008 (id. at 260); September 23, October 8, November 10, and December 17, 2008 (id. at 256); January 14 and February 5, 2009 (id.). There is also a report from Dr. Simon that mentions records from Dr. Mitamura dating to January 7, February 3, March 9, March 29, and April 27, 2011. (Id. at 373). While it is not entirely clear which of these missing records reflect contemporaneous appointments and which reflect reports about earlier appointments, they probably include both.

13

healed, and that there was no meniscal tear or ligamentous injury. (Id. at 272).[19] In July 2009, Dr. Mitamura recorded that Mr. Cabreja had developed a stress fracture of the right knee medial tibial plateau due to "alteration of gait" and bone weakness from his previous fracture. (Id. at 270).[20] However, an MRI in July 15, 2010 revealed that the stress fracture had healed. (Id. at 231). In June and July of 2012, Dr. Mitamura's examination notes state that Mr. Cabreja again complained of knee pain, and Dr. Mitamura noted evidence of "marked tenderness" at the medial joint line and the presence of muscle atrophy of the vastus medialis.[21] (Id. at 383, 388). In June 2012, Dr. Mitamura's final "impression," or diagnosis, of the right knee was "internal derangement" (id. at 388) and x-rays taken in July showed an effusion without gross fracture.[22] (Id. at 383).

---

[19] The January 2, 2009 results were compared to Mr. Cabreja's prior MRI, apparently conducted on November 14, 2007. (Tr. 272; see also id. at 264).

[20] After examining Mr. Cabreja, Dr. Mitamura disclosed this information, along with his other findings, in a follow-up letter to the Worker's Compensation Board. (Tr. 270-71). In this letter, Dr. Mitamura referenced "MRI studies this month." (Id. at 270). The record does not include reports from these studies, although they are referenced by comparison in the reports of the July 2010 MRIs. (See id. at 230-31).

[21] One of the "four separate muscles" making up "[t]he quadriceps muscle." 4 ATTORNEYS MEDICAL ADVISOR § 35:196.

[22] Neither the x-ray films nor reports of these x-rays are included in the record.

14

### ii. Back Injury and Pain

On July 7, 2009, Dr. Mitamura saw Mr. Cabreja for a follow-up examination, and reported that Mr. Cabreja complained of having "severe low back pain with radiation to the legs." (Tr. 270).[23] Dr. Mitamura also indicated that Mr. Cabreja had "[m]arked tenderness" at his lumbar spine with a "decrease in light touch to the left leg." (Id.). Concluding his report, Dr. Mitamura's opined that Mr. Cabreja had lumbar radiculopathy,[24] as well as lumbar-spine pain and "disc herniation with instability" as a result of his placing stress upon his lumbar spine due to his alteration in gait. (Id.).

A July 2010 MRI revealed: (1) "[m]ild posterior facet arthrosis"[25] at the L3/4 level, (2) disc bulging,[26] posterior facet arthrosis, mild acquired central canal and bilateral

---

[23] Dr. Mitamura recorded these findings in the aforementioned letter to the Worker's Compensation Board, a report that further confirms that plaintiff was being treated by Dr. Mitamura for his back pain prior to the date the letter was drafted. (Tr. 270-71).

[24] "Damage to or entrapment of the spinal nerve roots as they exit the spinal canal." 7 ATTORNEYS MEDICAL ADVISOR § 71:89.

[25] Arthrosis is a general term that describes "[d]egenerative joint changes." STEDMANS MEDICAL DICTIONARY 76390.

[26] "Protrusion or bulging describes a posterior bulging of the disc beyond its normal bounds, but with the outer annulus fibrosus still intact." 7 ATTORNEYS MEDICAL ADVISOR § 71:174. The "annulus fibrosus" is "the ring of fibrocartilage and fibrous tissue forming the circumference of the intervertebral disc." STEDMANS MEDICAL DICTIONARY 52110.

lateral recess stenosis,[27] and mild bilateral foraminal[28] stenosis at the L4/5 level, and (3) retrolisthesis,[29] disc bulging, posterior marginal ridging, and posterior facet arthrosis at the L5/S1 level, that all "contribute to moderate bilateral foraminal stenosis." (Id. at 230, 232). The MRI also revealed that the left foraminal stenosis associated with the L4/5 level was "accentuated by a broad-based left foraminal disc herniation/protrusion"[30] and that the L4/5 results generally correlated with left radiculopathy. (Id. at 230).

In February 2011, Dr. Mitamura referred Mr. Cabreja to Dr. Sandra Carniciu[31] for electromyography (EMG)[32] and nerve

---

[27] Stenosis is "defined as a narrowing of the vertebral canal, the lateral recesses, or vertebral foramina through which the spinal nerves pass." 7 ATTORNEYS MEDICAL ADVISOR § 71:143.

[28] Foraminal relates to foramen, which is comprised of three openings that help make up the structure of the vertebrae. The three openings include the vertebral foramen, intervertebral foramen, and transverse foramen. 7 ATTORNEYS MEDICAL ADVISOR § 71:2.

[29] "Retrolisthesis is a posterior displacement of a vertebral body that can cause localized back pain, pain on hyperextension, and sciatic pain due to irritation of the first sacral nerve root." Kessler v. Colvin, 48 F. Supp. 3d 578, 586 n.5 (S.D.N.Y. Sept. 17, 2014) (citing DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 619 (27th ed. 1988)).

[30] "Herniated intervertebral discs are a major source of back pain and disability associated with the back . . . Symptoms of disc herniations are usually produced on only one side because the herniation usually occurs on only one side." 7 ATTORNEYS MEDICAL ADVISOR § 71:179.

[31] Dr. Carniciu is Board Certified in Neurology and Clinical Neurophysiology and is affiliated with New York-Presbyterian/Columbia, with her primary office located in Sleepy Hollow, NY. (See Sandra Carniciu, MD, http://profiles.nyp.org/physician/scarniciu (last visited Aug. 31, 2015); Tr. 226-29). Her letterhead represents that she is a "Diplomate" in Neurology, Clinical Neurophysiology, and Electrodiagnostic Medicine. (Tr. 226).

[32] "EMG evaluates neuromuscular function by monitoring the effect that the nerve impulse has on its associated muscle, while nerve conduction tests focus directly on the nerve, measuring how long it takes to transmit an impulse." 2 ATTORNEYS MEDICAL ADVISOR § 20:21. "The test can determine the extent

16

conduction velocity (NCV)[33] testing. (Id. at 313-16).[34] Dr. Carniciu concluded that the electrophysiological evaluation of the lower extremities was "normal," with no evidence of lumbar radiculopathy or focal entrapment neuropathy. (Id. at 316).

In March 2011, Dr. Mitamura ordered a CT scan of Mr. Cabreja's lumbar spine, which showed central spinal stenosis at the L4-5 disc space, along with degenerative disc disease[35] and central disc protrusion that "is associated with" bilateral foraminal stenosis. (Id. at 233-34). Two months after the MRI, on May 2, 2011, after conservative therapy efforts of physical therapy,[36] medication,[37] and injection[38] failed to sufficiently

---

and location of neuromuscular disease, including carpal tunnel syndrome, pinched nerves and degenerative disc diseases." Id.

[33] An NCV test is

ordinarily administered to patients with symptoms like weakness or paralysis in one body area, tingling, numbness or pain. By measuring the time it takes an electrical impulse to travel along a nerve after the nerve has been stimulated, the test excludes or minimizes the possibility of the symptoms being caused by certain underlying disorders.

2 ATTORNEYS MEDICAL ADVISOR § 20:21.

[34] Dr. Carniciu performed an NCV test on plaintiff's lower extremities and an EMG test on plaintiff's lower extremities and lumbar paraspinal muscles. (Tr. 313-16).

[35] "[D]egenerative disc disease refers to a condition in which pain is caused from a damaged disc. A wide range of symptoms and severity is associated with this condition." DEGENERATIVE DISK DISEASE, https://www.cedars-sinai.edu/Patients/Health-Conditions/Degenerative-Disc-Disease.aspx (last visited Aug. 31, 2015). Disorders include disc herniation, bulging, general degeneration, and internal derangement. 7 ATTORNEYS MEDICAL ADVISOR § 71:164.

[36] Plaintiff participated in physical therapy beginning some time in early 2008 (Tr. 264, 266), although those records are not contained within the administrative record provided. In his January 23, 2008 report -- referring exclusively to treatment for plaintiff's knee injury -- Dr. Carton reported that plaintiff had already begun physical therapy that month. (Id.

help his lumbar condition, plaintiff underwent a lumbar spinal instrumentation and fusion L5-S1 surgery[39] performed by Dr. Mitamura. (Id. at 221-22, 245).

On September 15, 2011, Dr. Mitamura's colleague and orthopedic surgeon, Dr. Alex Gitelman,[40] examined plaintiff and noted that Mr. Cabreja reported that his lower back pain was

_____

at 266). However, in his May 27, 2008 report -- possibly referring to both plaintiff's knee and back injuries -- Dr. Carton wrote that plaintiff's initial physical therapy evaluation was performed on March 25, 2008. (Id. at 264). In any event, on June 23, 2010, Dr. Robbins wrote that plaintiff was "continu[ing] with physical therapy" for his back (id. at 249) and, on February 26, 2011, that plaintiff had "failed physical therapy" for his back (id. at 245), although Dr. Liu reported continued physical therapy as of at least June 11, 2012. (Id. at 385).

[37] The records reflect that Mr. Cabreja had been taking Hydrocodone since at least August 2008 (Tr. 259), although plaintiff testified that he only began taking this medication in 2009. (Id. at 50). Plaintiff ultimately stated that he took an extended break from this medication in approximately 2010, due to stomach-related side-effects, and restarted taking the Hydrocodone in 2011, after his back surgery. (Id. at 55). This narrative generally accords with other scattered records, which reflect that plaintiff discontinued the Hydrocodone on June 23, 2010 (id. at 249), was still not taking the medicine as of July 8, 2010 "to give his stomach a break" (id. at 287), November 11, 2010 (id. at 248), and February 2, 2011. (Id. at 226). By June 22, 2011, plaintiff was again taking the Hydrocodone (id. at 225), which he continued through July 27, 2011 (id. at 276), August 31, 2011 (id. at 275), and December 6, 2011 (id. at 342), although these latter records suggest that plaintiff still had some stomach problems with this medication post-surgery. (See id. at 275). As of the November 8, 2012 hearing (id. at 33), plaintiff was still taking the Hydrocodone. (Id. at 51).

[38] Mr. Cabreja underwent lumbar facet blocks and epidural steroid injections, performed by Dr. Liu, in an attempt to help his condition. (Tr. 281-83, 288-90, 295-98, 304-08). While helping slightly, the injections failed to relieve his symptoms in long term, as Mr. Cabreja's testimony and the medical records indicate. (Id. at 55, 280, 293). There is also evidence to suggest that the injections' efficacy lessened over time. (Id. at 293 ("The whole series did not seem as effective as the last one, almost 10 months ago.") (record dated Feb. 1, 2010)).

[39] Spinal fusions, "whether attempted with or without use of spinal instrumentation to aid in the process, is typically done" for one of three reasons, to (1) "[p]revent or correct deformity," (2) "[s]tabilize the spine after trauma or pathologic destruction," or (3) "[e]liminate painful movement of specific spinal segments." 3 ATTORNEYS MEDICAL ADVISOR § 28:404.

[40] Dr. Gitelman is an orthopedic surgeon who works with Dr. Mitamura at Beacon Hill Orthopedics. (Tr. 219).

18

"significantly better" and that the pain radiating to his bilateral lower extremities had "very significantly improved" since the surgery. (Id. at 219). Dr. Gitelman recorded that plaintiff denied any weakness or numbness, was in no acute distress, and rated him 5/5 for the motor-strength portion of the examination.[41] (Id.). Dr. Gitelman noted that Mr. Cabreja was "improving as expected," but still diagnosed him with post-surgical "[l]umbosacral degenerative disc disease and stenosis." (Id.).

On March 28 2012, Dr. Mitamura[42] examined plaintiff, who reported that, while his overall pain had improved since the lumbar surgery, he was still feeling radiating pain down his bilateral lower extremities, as well as lower-back pain. (Tr. 391-92). Dr. Mitamura also observed that plaintiff had gained "some weight" and that plaintiff "feels his pain is a little bit worse following this weight gain." (Id. at 391).[43] Dr. Mitamura

---

[41] The motor strength examination tested bilateral hip flexors, knee flexion/extension, and ankle dorsiflexion (movement of foot upwards) and plantarflexion (movement of foot downwards). (Tr. 219). See 1 ATTORNEYS MEDICAL DESKBOOK § 11:5. Dr. Gitelman also performed both reflex and vascular examinations. (Id.).

[42] We note that this particular record was in the form of a letter seemingly written by Dr. Mitamura, but "[d]ictated by" Dr. Gitelman. (Tr. 392).

[43] Plaintiff's weight and weight fluctuations are not mentioned in many of the records before us. The hospital records from November 7, 2007 state that plaintiff then weighed 210 pounds. (Tr. 364). According to Dr. Carniciu, plaintiff still weighed the same as of February 18, 2011. (Id. at 228). Subsequently, in an October 3, 2011 report provided to the SSA, plaintiff recorded his weight as 215 pounds. (Id. at 167). By December 6, 2011,

noted that plaintiff was alert, oriented, and not in any acute
distress, and denied any weakness, numbness, or any problems
with balance or gait. (Id.). The doctor observed that his
sensation was "intact to light touch from L3 to S1," and his
motor strength examination was "5/5."[44] (Id.). However, Dr.
Mitamura diagnosed plaintiff with post-surgical "L5, S1 disc
herniation with degenerative disc disease." (Id.). Concluding
his report, Dr. Mitamura recommended that plaintiff continue
with physical therapy and undertake a weight-loss program. (Id.
at 392). Dr. Mitamura went on to caution that if Mr. Cabreja did
"not improve then again," they would need to "possibly consider
a revision surgery." (Id.).

In addition to exam notes, in March 2012 Dr. Mitamura
completed the first of several New York State Worker's
Compensation C-4.2 Doctor's Progress Reports. (Id. at 389-92).[45]

_____

however, as reflected in examination results from Dr. Pelczar-Wissner,
plaintiff weighed 250 pounds. (Id. at 343). This rapid increase in weight
from October 2011 generally accords with another of Dr. Pelczar-Wissner's
notes from December 2011, which states that plaintiff "reports increased
appetite and gained approximately 30 lb." (Id. at 337). It is this late-2011
weight increase to which Dr. Mitamura was likely referring. (See id. at 391-
92). We note that the record is not entirely consistent on this front; in
December 2011, Dr. Simon examined plaintiff and noted that he weighed 218
pounds. (Id. at 374).

[44] The examination tested bilateral hip flexors, knee flexion/extension,
ankle dorsiflexion/plantarflexion, and "EHL/FHL" (Tr. 391), which
respectively are the extensor hallucis longus -- a muscle that moves the big
toe -- and the flexor hallucis longus -- a muscle that flexes the big toe. 1
ATTORNEYS MEDICAL DESKBOOK §§ 5:7-8.

[45] Filed by the healthcare provider, a C-4.2 Doctor's Progress Report
"is used for the 15 day report after first treatment, and for each follow-up

20

In that report, he checked a box that said that plaintiff "cannot return to work,"[46] citing chronic pain and loss of mobility and diagnosing him with "spinal instability"[47] and "thoracic or lumbosacral neuritis or radiculopathy." (Id. at 389-90).

Plaintiff saw Dr. Mitamura again on June 21, 2012, at which time he complained of lower-back pain radiating down his legs. (Id. at 386-88). Dr. Mitamura noted that there was "marked tenderness" in plaintiff's "mid thoracic spine going down the lumbar spine to the paravertebral region of pain radiating to the right hip region in particular with pain at the posterior

---

visit scheduled when medically necessary while treatment continues but not more than 90 days apart." Workers' Compensation Forms for Health Care Providers, http://www.wcb.ny.gov/content/main/forms/Forms_HEALTH_PROVIDER.jsp (last visited Aug. 30, 2015). It is filed with the Workers' Compensation Board, insurance carrier, injured employee or his/her representative. Id. The record contains four of these reports filed by Dr. Mitamura, dated March 28, 2012 (Tr. 389-92), June 21, 2012 (id. at 386-88) July 24, 2012 (id. at 381-83), and September 4, 2012 (id. at 378-80), and one such report filed by Dr. Liu dated June 11, 2012. (Id. at 384-85). We note that the June 21, 2012 report by Dr. Mitamura is dated to May 21, 2012 -- but given the date of the examination referenced (June 21, 2012), we take the May 21 date to be a scrivener's error. (See id. 386-88).

[46] On the C-4.2 form, there are three options the doctor may check: 1) "Patient cannot return to work because (explain)," 2) "Patient can return to work without limitations on (specific date)," 3) "Patient can return to work with the following limitations (check all that apply)." (See, e.g., Tr. 387). Dr. Mitamura chose the first option on all of the C-4.2 forms that he completed, as did Dr. Liu. (Id. at 379, 382, 385, 387, 390).

[47] Spinal instability is "the inability of the spinal column, under physiologic loading, to maintain its normal configuration; [it] can result from congenital defects, trauma, degenerative change, or neoplastic diseases affecting the vertebrae, intervertebral discs, or spinal ligaments; [and it] may lead to damage to the spinal cord or nerve roots or to painful spinal deformity." STEDMANS MEDICAL DICTIONARY 448560.

superior iliac spine."[48] (Id. at 388). Dr. Mitamura recommended that Mr. Cabreja undergo lower extremity electromyography testing, as well as MRIs and treatment for a neck injury, which, according to Dr. Mitamura, resulted from plaintiff's lumbar injury. (Id.).[49] Dr. Mitamura opined that plaintiff's continual "forward bend position in the lumbar spine create[d] a need for extension at the cervical spine to create a horizontal gaze and the patient has developed a cervical spine injury." (Id.). On the attendant Worker's Compensation C-4.2 Doctor's Progress Report, Dr. Mitamura again concluded that plaintiff was not able to return to work due to chronic pain and loss of mobility and again diagnosed Mr. Cabreja with spinal instability and thoracic or lumbosacral neuritis or radiculopathy. (Id. at 386-87).

Dr. Mitamura again examined Mr. Cabreja on July 24, 2012. (Id. at 381-83). Plaintiff presented with thoracolumbar spine[50] pain, "progression and increased [] pain at the right leg," as well as "difficulty in ambulation," and was noted to have a left paravertebral muscle spasm and a spasm in his lower buttocks.

---

[48] "A region of the pelvic bone." 1 ATTORNEYS MEDICAL DESKBOOK § 5:18.

[49] There is no evidence in the record that indicates whether these recommended EMGs or MRIs were completed or whether there was treatment for his neck injury. We note, however, that in a November 5, 2012 letter to the SSA, plaintiff's counsel wrote that "Dr. Mitamura has even indicated the need for a new EMG as the claimant is not getting any better" (Tr. 215), implying that as of that date, this test had not been conducted.

[50] A term referring to "12 thoracic and 6 lumbar joints between 12 thoracic vertebrae, 5 lumbar vertebrae and the sacrum." 1 ATTORNEYS MEDICAL DESKBOOK § 12:3.

22

(Id. at 383). Dr. Mitamura noted that there was "marked tenderness" in plaintiff's lumbar spine and between his thoracic spine and lumbar spine. (Id.). A radiograph obtained of plaintiff's lumbar spine showed that there was slight lateral subluxation[51] and retrolisthesis at the L4-L5 level and that there was retrolisthesis and foraminal stenosis of the "junction superior to L4-L5." (Id.). Dr. Mitamura's C-4.2 report for July 2012 essentially matched that of the previous month. (Id. at 381-82).

The last exam with Dr. Mitamura for which there is documentation in the record took place on September 4, 2012. (Id. at 378-80). Plaintiff described pain radiating down the buttocks musculature, and Dr. Mitamura noted tenderness at the greater trochanteric region,[52] the right hip, and right side. (Id. at 380). Radiographs of the right hip showed results consistent with an effusion and that "[b]oth bones spur . . .

---

[51] "A subluxation is the loss of some, but not all contact between or among the surfaces of the adjacent bones of a joint." 4 ATTORNEYS MEDICAL DESKBOOK § 35:22.

[52] "Trochanteric fractures of the hip are considered to include all fractures of the upper part of the femur in the region of the greater and lesser trochanters and below the capsule of the hip joint." 4 ATTORNEYS MEDICAL ADVISOR § 35:180. The greater and lesser trochanters are terms used to describe "the area of widened bony protuberances" in the "hip area." 1 ATTORNEYS MEDICAL ADVISOR § 2:46.

off the lateral acetabular surface."[53] (Id.). As earlier, Dr.
Mitamura recommended lower-extremity EMG nerve testing to
evaluate nerve compression. (Id.). The doctor also noted that he
had advised plaintiff to check his blood pressure at least twice
per week because of the medication he was on at the time. (Id.).
Dr. Mitamura's C-4.2 report for September 2012 matched those of
June and July 2012. (Id. at 378-79).

### c. Eugene Liu, M.D.

Dr. Eugene Liu is a spine specialist[54] who examined Mr.
Cabreja more than twenty times between July 2008 and August
2011. (Id. at 275-312). It is also clear from the record that
plaintiff had an ongoing treatment relationship with Dr. Liu
through at least July 2012. (Id. at 383-85).[55]

---

[53] The acetabulum consists of "portions of the innominate bone of the
pelvis, which form the socket of the hip joint . . . Together the head of the
femur and the acetabulum form the hip joint." 1 ATTORNEYS MEDICAL ADVISOR § 2:46.
[54] Dr. Liu is a "Fellowship-Trained Spine Specialist" and medical
director at Restoration Sports and Spine Center, which has offices in both
Dobbs Ferry and New York City. EUGENE LIU, M.D.,
http://www.sportspinecare.com/dr.html, last visited Sept. 1, 2015). WebMD
also indicates Dr. Liu is affiliated with New York Presbyterian Hospital
Columbia University Medical Center, DR. EUGENE J. LIU, M.D.,
http://doctor.webmd.com/doctor/eugene-liu-md-aec06ff9-2d4b-4396-8908-
c28321f16aa8-overview (last visited Sept. 1, 2015).
[55] The records reflect that plaintiff was examined and/or treated by Dr.
Liu on at least the following dates: 7/14/08, 9/15/08, 4/26/09, 5/11/09,
5/14/09, 5/26/09, 6/9/09, 6/30/09, 8/4/09, 9/8/09, 11/5/09, 12/17/09,
12/28/09, 1/7/10, 2/1/10, 3/8/10, 4/12/10, 5/20/10, 5/27/10, 6/10/10, 7/8/10,
8/12/10, 9/16/10, 11/5/10, 12/1/10, 12/8/10, 12/22/10, 1/14/11, 2/25/11,
4/1/11, 6/22/11, 7/27/11, 8/31/11. (Tr. 275-312). The records also include a

### i. Pre-Lumbar Fusion Surgery

During the first exam, Dr. Liu recorded that plaintiff presented with symptoms of back pain and "bilateral lower extremity radicular symptoms, along the L5-S1 distribution, more so on the right side." (Id. at 311). Dr. Liu further indicated in his exam report that Mr. Cabreja's lumbar spine MRI report, which showed a "multi-level disc bulge at L4-5 and L5-S1," corresponded with his symptoms. (Id.). Dr. Liu noted that plaintiff was walking with a cane and an "antalgic gait,"[56] but was in "no acute distress," and that his reflexes and sensation were intact. (Id. at 312). Dr. Liu also reported that plaintiff had "limited range of motion in the lumbar spine and experienced discomfort with flexion and extension." (Id.). Moreover, plaintiff's right straight-leg-raising[57] test permitted him to lift only 20 degrees with pain. (Id.). Dr. Liu's concluding impression was that plaintiff had back pain, a multi-level disc

---

single report from Dr. Liu to the Workers Compensation Board that reflects an examination that took place on May 25, 2012 (id. at 384-85) as well as a July 24, 2012 report from Dr. Mitamura stating that plaintiff "also is receiving injection treatments with Dr. Liu." (Id. at 383).

[56] An antalgic gait is "a characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side." STEDMANS MEDICAL DICTIONARY 359070.

[57] "Straight leg raising (SLR) . . . is a procedure for stretching the sciatic nerve to see if the patient's radicular symptomatology is reproduced. Each hip is alternately flexed with the knee extended; the extent to which each leg can be lifted is noted. Normally, the leg can be raised some 70 to 80 degrees without discomfort if there is no pathology." 7 ATTORNEYS MEDICAL ADVISOR § 71:8.

25

bulge, and lumbar radicular symptoms. (Id.). Dr. Liu gave plaintiff a few samples of Lidoderm patches,[58] prescribed unspecified medication,[59] and requested authorization (presumably from worker's compensation) for epidural injections. (Id.).

Mr. Cabreja's next exams, on September 15, 2008 and May 11, 2009, revealed similar results, and Dr. Liu opined both times that plaintiff "remains disabled and not able to work at this time." (Id. at 309-10). Following the May 11, 2009 exam, Mr. Cabreja had three lumbar epidural steroid injections from May to June 2009.[60] (Id. at 303-09). After the third epidural, in the June 9, 2009 exam notes Dr. Liu indicated that Mr. Cabreja reported that the injection helped "quite a bit" and that his radicular symptoms had "eased off." (Id. at 303). However, Dr. Liu recorded that Mr. Cabreja's straight-leg-raising test permitted him to lift only 20 degrees with discomfort, although he had "minimal tenderness to palpation in the lumbar level." (Id.).

According to the June 30 and August 4, 2009 exam reports,

---

[58] A Lidocaine patch, branded as Lidoderm, "[t]reats nerve pain." LIDOCAINE PATCH, U.S. NAT'L LIBRARY OF MEDICINE, http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010942/ (last visited Aug. 20, 2015).

[59] From the exam report, it is unclear whether Dr. Liu gave Mr. Cabreja a prescription for Lidoderm patches or for another medication. (Tr. 311).

[60] The epidural injections were on April 14, May 14, and June 9, 2009. (Tr. 304-08).

Mr. Cabreja claimed to be improving, although he was still experiencing "minimal" back pain and radicular symptoms. (Id. at 301-02). Dr. Liu also noted that Mr. Cabreja complained of pain from a stress fracture in his right knee and had "difficulty walking." (Id. at 302). Dr. Liu indicated that Mr. Cabreja's back pain and radicular symptoms exhibited "some improvement" despite his lumbar spine having a "stiff" range of motion, especially with extension. (Id.). In the doctor's June notes, he opined that Mr. Cabreja "remains disabled and not able to work at this time." (Id.).

Mr. Cabreja's September 8, 2009 exam yielded findings similar to those from the August examination. (Id. at 300). Dr. Liu recorded that plaintiff's paraspinal muscles were again tender to touch and that his lumbar spine had a limited range of motion, but that his sensory and motor exam was "overall intact." (Id.). Dr. Liu's final impression was that plaintiff had back pain, facet syndrome, and disc bulge. (Id.). Dr. Liu again opined that plaintiff "remains disabled and not able to work at this time." (Id.).

The report for Mr. Cabreja's exam on November 5, 2009 stated that he reported having radicular symptoms and numbness

27

in his right lower extremity, as well as having "some left lower extremity problems." (Id. at 299). Moreover, Dr. Liu recorded that plaintiff's tendon reflexes were "trace" and his right straight leg-raising-test permitted a raise only to 10 degrees with pain. (Id.). Between December 2009 and January 2010, plaintiff had three more lumbar epidural steroid injections. (Id. at 294-98).[61]

Mr. Cabreja followed up with Dr. Liu on February 1, 2010. (Id. at 293). According to Dr. Liu, plaintiff reported that the injections had "helped quite a bit," but that he still had pain. (Id.). Regarding this set of injections, Dr. Liu concluded that they "did not seem as effective as the last one, almost 10 months ago." (Id.). Dr. Liu noted that plaintiff's paraspinous area was tender to touch, but that his light touch sensation in his lower extremity was "overall intact." (Id.).

The March and April 2010 exams yielded similar results. (Id. at 291-92). According to Dr. Liu's reports, Mr. Cabreja indicated that his "steady back pain and radicular symptoms have eased off." (Id. at 291). Dr. Liu also reported that Mr. Cabreja had intact lower-extremity sensation, but indicated that his

---

[61] The dates of the epidural injections were December 17, 2009, December 28, 2009, and January 7, 2010. (Tr. 294-98).

lumbar-spine range of motion was "poor, especially with extension." (Id.). Dr. Liu concluded that Mr. Cabreja had lumbar disc derangement and facet syndrome. (Id.). Dr. Liu recommended continued physical therapy and use of medication, and advised Mr. Cabreja to decrease the amount of time he wears his back brace. (Id.). In the April report, Dr. Liu opined that plaintiff "remains disabled and not able to work at this time." (Id.).

On May 20, May 27, and June 10, 2010, Dr. Liu administered lumbar facet block injections to Mr. Cabreja. (Id. at 288-90).[62] In Dr. Liu's July 8, 2010 follow-up exam report, it was noted that plaintiff reported that although he still felt pain, the lumbar facet injections "decreased the pain a bit." (Id. at 287). Nevertheless, Dr. Liu added that while plaintiff was experiencing "minimal tenderness" to palpation in the lumbar paraspinal muscles, his range of motion was "pain inhibited." (Id.). It was also noted that Mr. Cabreja felt knee pain. (Id.). Dr. Liu indicated that his range of motion of the knee was "functional," but that the "medial joint lines" were tender to palpation. (Id.). Concluding the report, he opined that plaintiff "remains disabled and unable to work at this time." (Id.).

---

[62] The record does not include any exam reports for these dates, only operative reports about the injection. (See Tr. 288-90).

The August 12 and September 16, 2010 exams yielded similar findings, with Dr. Liu recording that Mr. Cabreja complained of lower axial back pain that "constantly hurt," and knee and hip pain that had "increas[ed] in severity." (Id. at 285-86). In August 2010, Dr. Liu noted that Mr. Cabreja's lumbar range of motion was "severely" limited on all planes and that his lumbar paraspinal muscles and right-knee joint lines were both tender to palpation. (Id.). Dr. Liu's opinion in both months was that plaintiff "remains disabled and not able to work at this time." (Id.).

On November 5, 2010, Dr. Liu examined Mr. Cabreja and reported that plaintiff complained of an "increase in pain," more specifically "sharp pains [that] shoot up" his mid-back and go down his right knee and hip. (Id. at 284). Dr. Liu indicated that Mr. Cabreja's lumbar spine had a stiff range of motion and that he had a muscle spasm in the left paraspinal area, but that his seated, straight-leg-raising test was negative and he had no gait disturbances. (Id.). Dr. Liu continued to opine that plaintiff "remains disabled and not able to work at this time." (Id.).

On December 1, 8, and 22, 2010, plaintiff underwent three

30

more lumbar facet blocks to treat his facet syndrome with back pain. (Id. at 281-83). In January 2011, Dr. Liu recorded that Mr. Cabreja reported that the injections had "alleviated his symptoms for about 2-3 weeks and his pain had not returned." (Id. at 280). Dr. Liu wrote that plaintiff had a restricted range of motion in all directions, but that his sensory and motor exam was overall intact. (Id.). Dr. Liu also recorded Mr. Cabreja's claim that he could not sit for more than 15 minutes and always had to stand. (Id.). Dr. Liu again opined that plaintiff "remains disabled and not able to work at this time." (Id.).

On February 25 and April 1, 2011, Dr. Liu again examined Mr. Cabreja. (Id. at 278-79). In February, plaintiff reported lower-back pain and "a burning type of sensation along his axials" that "tends to radiate to his right lower extremity stopping at the knee." (Id. at 279). Dr. Liu noted "separate right knee pain," as well as plaintiff's continued physical therapy and upcoming surgery. (Id.). In April, plaintiff returned to Dr. Liu, reporting "sharp pains" in the low back. (Id. at 278). In both records, Dr. Liu noted restricted or decreased ranges of motion, but intact sensory and motor exams. (Id. at 278-79).

ii. Post-Lumbar Fusion Surgery

In the wake of Dr. Mitamura's lumbar fusion surgery on May 2, 2011 (id. at 221-22, 245), Mr. Cabreja followed up with Dr. Liu on June 22, 2011. (Id. at 277). According to Dr. Liu, Mr. Cabreja reported that he was "doing a bit better," and -- although he still had pain in the same areas -- it was "a lot less frequent and a lot less intense." (Id.). One month later, in July 2011, Dr. Liu recorded that plaintiff's lumbar paraspinal muscles were tender and that his range of motion was stiff, but that his sensory and motor exams were intact. (Id. at 276). According to Dr. Liu's notes, Mr. Cabreja reported that he had axial lower-back pain, but no radicular symptoms, and had "mild" pain walking, requiring him to "move very slowly." (Id.). In August 2011, Dr. Liu's examination revealed that despite having intact sensory and motor lower-extremity exams, Mr. Cabreja's condition had worsened, as his lumbar paraspinal muscles were "extremely tender" to palpation and his range of motion was "basically nonexistent." (Id. at 275). Mr. Cabreja did report, however, that "[h]is leg symptoms have resolved." (Id.). Finally, Mr. Cabreja told Dr. Liu that he wore his back brace all day, because without it, he felt "excruciating pain." (Id.).

32

Although the records from Dr. Liu's office generally cease after August 2011, there are two documents that reflect a continued treatment relationship between him and Mr. Cabreja, at least in the summer of 2012. (See id. at 383-85). In June 2012, after a May 25, 2012 examination, Dr. Liu wrote a C-4.2 report to the Workers' Compensation Board. (Id. at 384-85). Dr. Liu diagnosed plaintiff with HNP[63] and lumbosacral radiculopathy (id. at 384) and checked the box reflecting that plaintiff could not return to work because of "back pain." (Id. at 385). Additionally, in July 2012, Dr. Mitamura observed that plaintiff was still "receiving injection treatments with Dr. Liu." (Id. at 383).

### iii. Hydrocodone Usage

As noted, plaintiff had been taking Hydrocodone since at least August 2008. (Id. at 259). In his July 8, 2010 report, Dr. Liu noted that Mr. Cabreja had stopped taking his pain medication because of its gastric side effects. (Id. at 287).[64] According to Dr. Liu, Mr. Cabreja had been feeling increased stomach pain, and had therefore gone to the emergency room,

---

[63] "Herniated nucleus pulposus," or "[a] protruding disc in the spine." 1 ATTORNEYS MEDICAL DESKBOOK § 5:10.

[64] During Mr. Cabreja's exam with Dr. John Robbins on June 23, 2010, he was advised to stop his Hydrocodone since he was experiencing gastric side effects. (Tr. 249).

where he was diagnosed with "some type of inflammation" and was prescribed Prilosec. (Id.). Dr. Liu's June 22, 2011 report is the first in the record to note that Mr. Cabreja had resumed taking Hydrocodone, at a rate of 10 mg approximately twice per day. (Id. at 225). In July 2011, Dr. Liu indicated that plaintiff was taking Hydrocodone for pain "only when it is severe, but even that makes his heart feel like it is racing." (Id. at 276). A month later, Dr. Liu noted that Mr. Cabreja was "basically limited to taking one Vicodin per day," because the Hydrocodone was causing Mr. Cabreja bladder problems, and that other pain medications created complications with his blood pressure and were therefore not viable options. (Id. at 275). See also supra p. 18 n.37.

d. John Robbins, M.D.

Dr. John Robbins, a Board Certified neurological surgeon,[65] examined Mr. Cabreja at least five times from December 2009 through April 2011 for his knee and back injuries. (Tr. 242, 245, 248-50).[66] At plaintiff's December 15, 2009 examination, Dr.

[65]        NEUROSURGERY,        http://phelpshospital.org/find-a-doctor/doctors/?ds=neurosurgery (last visited Sept. 1, 2015).

[66] Reference was also made by Dr. Carton to reports from Dr. Robbins dating to February 12, 2009 (Tr. 257) and May 28, 2009 (id. at 252), although neither of these reports is included in the record. In the SSA's "Explanation of Determination," mention is also made of a report from Dr. Robbins dating

Robbins noted that Mr. Cabreja presented with "persistent increasing back pain" that radiated into his right leg and knee.[67] (Id. at 250). In his notes, Dr. Robbins stated that plaintiff's symptoms were "somewhat consistent" with instability at the L4-L5 level, as revealed by an MRI. (Id.). On June 23, 2010, plaintiff presented with the same symptoms as his last visit, in December 2009, and Dr. Robbins decided that Mr. Cabreja should stop his pain medication because of the gastrointestinal side effects he was experiencing. (Id. at 249). After both the December 2009 and June 2010 appointments (as well as the November 2010 visit), Dr. Robbins wrote that plaintiff "continues to remain totally disabled from work." (Id. at 248-50).

On November 11, 2010, plaintiff continued to report back and knee pain. (Id. at 248). Dr. Robbins noted that plaintiff was "able to bear weight in plantar and dorsiflexion with limitation of lumbar motion," but still opined that "[h]e continues to remain totally disabled from work." (Id.). After this appointment, Dr. Robbins expressed an intention to "discuss

to October 19, 2011. (Id. at 73). This too is not included in the record before us.

[67] With the exception of the April 2011 appointment, Dr. Robbins noted that Mr. Cabreja reported this knee and back pain at every exam. (Tr. 242, 245, 248-250). The April 2011 session appears to have been largely devoted to reviewing the risks and benefits of plaintiff's upcoming surgery with Dr. Mitamura. (Id. at 242).

35

with Dr. Mitamura the surgical indications." (Id.).[68]

On February 16, 2011, Dr. Robbins noted that plaintiff had "failed" physical therapy, medication, and injection, and that Mr. Cabreja would therefore be "see[ing] Dr. Mitamura for final preoperative planning." (Id. at 245). The April 19, 2011 visit showed "[n]o change in exam," and Dr. Robbins reviewed "[t]he risks and benefits of surgery" with plaintiff. (Id.).

### D. Medical Records: Consulting Doctors

#### a. Robert Simon, M.D.

On December 16, 2011, Dr. Robert Simon, a specialist in physical medicine, rehabilitation, electrodiagnosist medicine, and pain management,[69] conducted an "Independent Medical Examination" of plaintiff and completed a report (Id. at 371-76), apparently for the Worker's Compensation Board. (See id. at 60). In his report, Dr. Simon noted that plaintiff's current complaints were of low back and right knee pain, although Dr.

---

[68] Although the record of the May 2009 appointment is not itself in the record, we observe that Dr. Carton wrote that, at that time -- in contrast with November 2010 and beyond -- "Dr. Robbins d[id] not [yet] feel it prudent to consider surgery." (Tr. 252).

[69] Dr. Simon's report states that he is licensed in New York State and is Board Certified in Physical Medicine and Rehabilitation and Electrodiagnostic Medicine, and has a subspecialty Certification in Pain Medicine. (Tr. 376). Dr. Simon examined Mr. Cabreja once. (Id. at 372-76).

Simon described plaintiff as being "in no apparent distress" when sitting. (Id. at 373-74). Dr. Simon also noted that despite walking with a cane, Mr. Cabreja's gait was normal, and he had no limp. (Id. at 374). Moreover, according to Dr. Simon, plaintiff was able to take off his shoes and socks, sit, stand, and get onto the examining table, all "independently." (Id.).

Dr. Simon conducted a number of clinical tests that he said yielded no indications of severe impairments. (Id. at 374-75). He recorded that Mr. Cabreja had "normal" range of motion in upper and lower extremities, including the cervical and lumbar spine. (Id. at 374). Dr. Simon reported "no muscle spasm" and "no atrophy of the musculature," and that the spine was not tender to palpation. (Id.).

Dr. Simon indicated that the Lasegue's Sign,[70] Fabere-Patrick's Test,[71] Spurling's Test,[72] and various leg-raising tests

---

[70] "The level of a disc herniation can be determined, in most cases, by the characteristic symptoms of compression of the various spinal nerve roots." 7 ATTORNEYS MEDICAL ADVISOR § 71:200. More specifically, "[w]hen the third-lumbar root is involved, straight-leg testing causes pain at 30 to 40 degrees, compared to the normal 90 degrees. This is known as a 'positive Laseque sign' and in this case, rules out hip joint disease." Id.

[71] Fabere, which "stands for Flexion, Abduction, [and] External Rotation in Extension," 2 ATTORNEYS MEDICAL DESKBOOK § 18:4, also known as Patrick's Sign, see id., is a "test to determine the presence or absence of sacroiliac disease." STEDMANS MEDICAL DICTIONARY 907150. "[W]ith the patient supine, the hip and knee are flexed and the external malleolus is placed above the patella of the opposite leg; this can ordinarily be done without pain, but, on depressing the knee, pain is promptly elicited in sacroiliac disease." Id.

were all negative. (Id. at 374-75). Dr. Simon also noted that plaintiff's motor testing of upper and lower extremities was 5/5 and that he had intact sensation. (Id. at 375).

Dr. Simon's final impressions were that Mr. Cabreja had "chronic opiate dependent neck and low back pain due to cervical and lumbar sprain," "failed back surgery syndrome,"[73] and had chronic right-knee pain "due to sprain/strain and a lateral tibial plateau fracture." (Id.). Dr. Simon further concluded that plaintiff had a "moderate work-related disability" and should avoid prolonged sitting and/or standing more than four hours per day, and should perform no lifting of greater than 25 pounds. (Id. at 376). Dr. Simon also recommended that Mr. Cabreja continue visiting a pain-management physician, but that he did not need further physical therapy. (Id. at 375-76).

---

[72] This evaluates cervical nerve-root impingement. "[T]he patient extends the neck and rotates and laterally bends the head toward the symptomatic side; an axial compression force is then applied by the examiner through the top of the patient's head; the test is considered positive when the maneuver elicits the typical radicular arm pain." STEDMANS MEDICAL DICTIONARY 908330.

[73] "Failed back [surgery] syndrome" refers to cases in which disc surgery fails to correct a patient's symptoms. 7 Attorneys Medical Advisor § 71:185. "The term applies to patients who have had surgery (sometimes multiple surgeries) for apparent disc problems, yet remain seriously incapacitated by their symptoms." Id. "Failed surgery is often attributed to the formation of scar tissue around spinal nerve roots, which produces pain because of nerve fiber compression." Id.

b. Catherine Pelczar-Wissner, M.D.

Dr. Catherine Pelczar-Wissner, an internist, examined plaintiff once, on December 6, 2011, and thereafter prepared a report. (Id. at 342-45). Dr. Pelczar-Wissner noted that plaintiff could not walk on his heels or toes without difficulty, that he declined to squat, and that he wore a molded back brace, which he removed for the exam. (Id. at 343). It was also noted that Mr. Cabreja was not in any acute distress, had a normal gait and stance, did not use any assistive devices, was able to rise from a chair without difficulty, and needed no help changing for the exam, or getting on and off the exam table. (Id.). Neurologically, Dr. Pelczar-Wissner observed no sensory deficit and measured his upper and lower extremity strength to be 5/5, nor did she observe any muscle atrophy, cyanosis,[74] clubbing,[75] or edema[76]. (Id. at 344). In her musculoskeletal examination, the doctor found that Mr. Cabreja's cervical spine had full lateral flexion and full rotary movement, both bilaterally, but recorded that flexion and extension was

---

[74] "Bluish skin color due to hypoxemia where the preponderance of skin color comes from deoxygenated blood." 2 Attorneys Medical Deskbook § 24:20.

[75] "[L]oss of the normal angle between the fingernail and its base." 8 Attorneys Medical Advisor § 89:62.

[76] "Edema is swelling caused by excess fluid trapped in your body's tissues. Although edema can affect any part of your body, it's most commonly noticed in the hands, arms, feet, ankles and legs." EDEMA, http://www.mayoclinic.org/diseases-conditions/edema/basics/definition/con-20033037 (last visited Aug. 31, 2015).

permitted only to 20 degrees for the lumbar spine. (Id.). According to Dr. Pelczar-Wissner, Mr. Cabreja's knees had full range of motion bilaterally. (Id.).

Dr. Pelczar-Wissner's diagnoses of Mr. Cabreja were post-surgery chronic low-back pain and "complete healing" of the right knee. (Id.). She assigned Mr. Cabreja a "stable" prognosis and recommended that he continue with physical therapy[77] and go for another consultation with Dr. Liu. (Id.). Concluding her report, Dr. Pelczar-Wissner advised that Mr. Cabreja had a "moderate restriction for walking" and a "marked restriction for bending, heavy lifting, and carrying." (Id.).

### c. Mark Weinberger, Ph.D.

Psychologist Mark Weinberger[78] examined plaintiff once, also on December 6, 2011. (Id. at 337-40). In his report, Dr. Weinberger generally noted that Mr. Cabreja was "cooperative"

---

[77] In Dr. Pelczar-Wissner's report, she notes that Mr. Cabreja, at the time of the examination, had been attending physical therapy three times per week. (Tr. 344).

[78] According to his website, Dr. Mark Weinberger is a New York State licensed psychologist and claims expertise in late-adolescent and adult geriatric mood and anxiety disorders. MARK I. WEINBERGER, PHD, MPH, http://www.markweinbergerphd.com/index.html (last visited Aug. 31, 2015). Dr. Weinberger lists office locations in Tarrytown, NY and New York City. Id. Dr. Weinberger also works for Complete Psychological Services, id., which is an outpatient mental health practice and has offices in New York City, Westchester, Long Island, and Washington, DC. COMPLETE PSYCHOLOGICAL SERVICES, http://www.markweinbergerphd.com/index.html (last visited Aug. 31, 2015).

and that "he adequately related." (Id. at 338). Plaintiff reported difficulty falling, and staying, asleep as well as an increased appetite and weight gain. (Id. at 337). According to Dr. Weinberger, Mr. Cabreja surmised that his sleep issues were possibly due to the Hydrocodone he was taking, as Mr. Cabreja reported that it "makes him restless." (Id.). Plaintiff also reported "mild depressive and anxiety symptoms," "sadness and excessive apprehension about the future," and "mild short-term memory loss." (Id. at 337-38). Plaintiff denied suicidal or homicidal ideation. (Id. at 338).

According to Dr. Weinberger, plaintiff was "groomed" and "appropriately" dressed, his motor behavior and posture were "normal," speech was fluent and clear, thought processes were coherent and goal-directed, the sensorium was clear, insight was "good," judgment was "good," cognitive functioning "appear[ed] average," attention and concentration, as well as recent and remote memory skills, were intact,[79] and he noted that plaintiff can manage his own money. (Id. at 338-39). Moreover, Dr. Weinberger reported that Mr. Cabreja could, inter alia, follow and understand simple directions and instructions, learn new tasks, perform complex tasks, make appropriate decisions, and

---

[79] Plaintiff was able to perform simple counting, calculations, and "serial 3s," as well as immediate and delayed memory exercises. (Tr. 338-39).

appropriately deal with stress. (Id. at 339).

The consultant described Mr. Cabreja's affect as depressed and his mood as dysthymic. (Id. at 338). He also noted that plaintiff reported having "significant difficulties" with "Activities of Daily Living" due to his medical problems. (Id. at 339).[80] Dr. Weinberger concluded that the exam's results are consistent with problems related to stress, but do not appear to be "significant enough to interfere with plaintiff's ability to function on a daily basis." (Id.). He determined that plaintiff's prognosis was "good" and recommended individual psychotherapy. (Id. at 340).

### d. L. Hoffman

L. Hoffman,[81] completed a "Psychiatric Review Technique"

---

[80] According to Dr. Weinberger's report, Mr. Cabreja claimed that he could shower and get dressed daily, in addition to going shopping once per week; however, he cannot cook, clean, or do laundry due to his back problems. (Tr. 339).

[81] While there is nothing in the relevant record that itself reflects the credentials of "Hoffman, L., Psychology," as the record lists him (see Tr. 346), the ALJ appears to believe him a doctor (id. at 20), a characterization we can neither discount nor conclusively confirm, although the ALJ goes so far as to assign L. Hoffman "great weight[] based upon [his or her] expertise in psychiatry and experience as [a] program doctor[]." (Id.).

We observe that in an online set of instructions, contained in the SSA's "Program Operations Manual System," the SSA explains that the person signing the Psychiatric Review Technique form "must be a psychiatrist or psychologist" if delivering "determinations that are less than fully favorable." DI 24505.025 EVALUATION OF MENTAL IMPAIRMENTS,

42

form on December 13, 2011. (Id. at 346-59). This thirteen-page record contains no information from L. Hoffman beyond the checking of two boxes, that there is "No Medically Determinable Impairment" and that "These findings complete the medical portion of the disability determination." (Id. at 346). L. Hoffman did not fill in dates for the prompt of "Assessment is from: ___ to current" (id.), did not even check "None" when prompted to characterize plaintiff's functioning in various categories of limitation (id. at 356), or write anything under the section labeled "Consultant's Notes." (Id. at 358). It is not clear whether L. Hoffman examined plaintiff or reviewed records; and if the latter, there is no information provided to suggest which records were reviewed by L. Hoffman.

### e. Paul Carton, M.D.

Dr. Carton, an orthopedic surgeon,[82] examined plaintiff five times between 2008 and 2009 on behalf of the Worker's Compensation Board, on January 23, 2008, May 21, 2008, July 30,

---

https://secure.ssa.gov/poms.nsf/lnx/0424505025#b (last visited Sept. 1, 2015). This "Program Operations Manual System "is a primary source of information used by Social Security employees to process claims for Social Security benefits." PUBLIC POLICY HOME, https://secure.ssa.gov/poms.nsf/home!readform (last visited Sept. 1, 2015).

[82] Dr. Carton is a New York State licensed and Board Certified orthopedic surgeon. (Tr. 251-69). Although Dr. Carton examined Mr. Cabreja five times, he is still considered a consultative physician on the basis that on all of his reports, it is stated that "no doctor/claimant relationship exists or is implied by this examination." (Id. at 254, 257, 261, 265, 268).

2008, April 21, 2009, and August 3, 2009. (Id. at 251-69). He
thereafter completed five New York State Worker's Compensation
Board "Practitioner's Reports of Independent Medical
Examination." (Id.).


### i. Knee Injury and Pain


Dr. Carton first examined Mr. Cabreja two months after the
accident, in January 2008. (Id. at 266-69). Dr. Carton noted
that plaintiff was walking with the assistance of two crutches
and a knee brace and diagnosed him with a right-knee lateral
tibial-plateau fracture. (Id. at 267-68).[83] Dr. Carton determined
that plaintiff exhibited a "temporary marked partial
disability," and was not capable of returning to work as a
maintenance worker, as he had only the ability to perform
sedentary activity and must avoid prolonged standing, sitting,
climbing, walking, kneeling, and crawling. (Id. at 268). In his
following, post-knee surgery visits, Mr. Cabreja used a cane and
complained of pain in his right knee. (Id. at 252, 256, 260,
264). During Mr. Cabreja's last exam, Dr. Carton diagnosed his
right knee with a stress fracture of the medial tibial plateau,[84]

---

[83] Mr. Cabreja's fracture was confirmed by radiographs done by Phelps
Memorial Hospital. (Tr. 369).

[84] This diagnosis was supported by an MRI reviewed by Dr. Carton, dated
June 15, 2009. (Tr. 253).

44

but found no evidence of instability or joint effusion. (Id. at 252-53).

### ii. Back Injury and Pain

According to Dr. Carton's notes, Mr. Cabreja presented with a new symptom of lower-back discomfort in May 2008. (Id. at 263-65). It was also noted that, along with back pain, Mr. Cabreja presented with numbness in his legs at his July 2008 exam. (Id. at 260).[85] In multiple exams, Dr. Carton recorded that Mr. Cabreja had moderate or mild restriction of rotation and lateral bending to the right and left, while the lumbar spine revealed no evidence of lumbar paravertebral muscle spasm. (Id. at 252, 256, 260). In July 2008, Dr. Carton diagnosed Mr. Cabreja with a "traumatic low back sprain/strain superimposed on preexisting lumbar spondylosis[86] with posterior disc bulges at L4-5 and L5-S1." (Id. at 261). Dr. Carton also stated that while plaintiff exhibited "a temporary moderate partial disability overall including the knee and back[,] I would render a temporary mild disability to the knee alone." (Id.).

---

[85] Dr. Carton determined that plaintiff's fall from his ladder in November 2007 was sufficient enough trauma to cause his low-back injury. (Tr. 261).

[86] "[A]n ordinarily symptomless bone defect near the root of the arch of a vertebra. This condition is believed to result either from a congenital defect, a fatigue failure, or both." 7 Attorneys Medical Advisor § 71:149.

At the final exam, Dr. Carton determined that Mr. Cabreja was capable of only sedentary activity and should avoid any attempts at lifting, bending, squatting, kneeling, crawling, and climbing. (Id. at 253). Dr. Carton's prognosis for Mr. Cabreja "remain[ed] guarded and uncertain," and he recommended that Mr. Cabreja be reevaluated by Dr. Robbins for possible surgical intervention. (Id.).

III. General Standards for Disability Insurance Benefits Eligibility

In order to qualify for disability insurance benefits, a claimant must demonstrate that he was disabled as of a date on which he was still insured. See, e.g., Arnone v. Bowen, 882 F.2d 34, 37 (2d Cir. 1989) (citing 42 U.S.C. § 423(a)(1)(A)); Feliciano v. Colvin, 2015 WL 1514507, *1 n.1 (S.D.N.Y. Mar. 31, 2015); Fleming v. Astrue, 2010 WL 4554187, *9 (E.D.N.Y. Nov. 2, 2010). For purposes of eligibility for benefits, an applicant is "disabled" within the meaning of the Act if he is unable "'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less

46

than 12 months.'"[87] McIntyre v. Colvin, 758 F.3d 146, 149-50 (2d Cir. 2014) (quoting 42 U.S.C. § 423(d)(1)(A)).

The Act requires that the relevant physical or mental impairment be "'of such severity that [plaintiff] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.'" Burgess v. Astrue, 537 F.3d 117, 120 (2d Cir. 2008) (quoting 42 U.S.C. § 423(d)(2)(A)). If the claimant can perform substantial gainful work existing in the national economy, it is immaterial, for the purposes of the Act, that an opening for such work may not be found in the immediate area where he lives or that a specific job vacancy may not exist. Butts v. Barnhart, 416 F.3d 101, 107 (2d Cir. 2004) (quoting 42 U.S.C. § 423(d)(2)(A)).

In assessing a claim of disability, the Commissioner must consider: "(1) objective medical facts; (2) diagnos[e]s or medical opinions based on those facts; (3) subjective evidence of pain and disability testified to by claimant and other witnesses; and (4) the claimant's background, age, and

---

[87] "Substantial gainful activity" is defined as work that "[i]nvolves doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; see also Flanigan v. Colvin, 21 F. Supp. 3d 285, 300 (S.D.N.Y. 2014); Calzada v. Astrue, 753 F. Supp. 2d 250, 267 n.39 (S.D.N.Y. 2010).

experience." <u>Williams ex rel. Williams v. Bowen</u>, 859 F.2d 255,
259 (2d Cir. 1988). The SSA regulations set forth a five-step
sequential process under which an ALJ must evaluate disability
claims. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920. The Second
Circuit has described this sequential process as follows:

> "<u>First</u>, the Secretary considers whether the claimant
> is currently engaged in substantial gainful activity.
> If he is not, the Secretary <u>next</u> considers whether the
> claimant has a "severe impairment" which significantly
> limits his physical or mental ability to do basic work
> activities. If the claimant suffers such an
> impairment, the <u>third</u> inquiry is whether, based solely
> on medical evidence, the claimant has an impairment
> which is listed in Appendix 1 of the regulations. If
> the claimant has such an impairment, the Secretary
> will consider him disabled without considering
> vocational factors such as age, education, and work
> experience; the Secretary presumes that a claimant who
> is afflicted with a "listed" impairment is unable to
> perform substantial gainful activity. Assuming the
> claimant does not have a listed impairment,[88] the
> <u>fourth</u> inquiry is whether, despite the claimant's
> severe impairment, he has the residual functional
> capacity to perform his past work.[89] <u>Finally</u>, if the
> claimant is unable to perform his past work, the
> Secretary then determines whether there is other work

---

[88] If a claimant has a "listed" impairment, he will be considered
disabled <u>per se</u> without an additional assessment of vocational factors such
as age, education, and work experience. If the plaintiff does not have a
listed impairment, the Commissioner must consider plaintiff's residual
functional capacity, which is his ability to do physical and mental work
activities on a sustained basis, despite limitations from her impairments.
<u>See</u>, <u>e.g.</u>, <u>Bush v. Shalala</u>, 94 F.3d 40, 44-45 (2d Cir. 1996). To determine
whether the applicant has a listed disorder, the ALJ must consult the
relevant criteria for each listing.

[89] Residual functional capacity ("RFC") is a claimant's maximum
remaining ability, despite her limitations, "'to do sustained work activities
in an ordinary work setting on a regular and continuing basis, and the RFC
assessment must include a discussion of the individual's abilities on that
basis.'" <u>Michaels v. Colvin</u>, 2014 WL 641463, *18 (S.D.N.Y. Feb. 18, 2014)
(quoting <u>Melville v. Apfel</u>, 198 F.3d 45, 52 (2d Cir. 1999)).

which the claimant could perform." The burden of proving disability, encompassing the first four of these steps, is on the claimant. The burden of proving the fifth step is on the Secretary.

Bush, 94 F.3d at 44-45 (emphasis in original) (quoting Rivera v. Schweiker, 717 F.2d 719, 722-23 (2d Cir. 1983)); see also Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009).

At the fourth step -- which requires determining the RFC -- if a claimant has more than one impairment, all medically determinable impairments must be considered, including those that are not "severe." 20 C.F.R. § 404.1545(a)(2). The assessment must be based on all relevant medical and other evidence, such as physical abilities, mental abilities, and symptomology, including pain and other limitations that could interfere with work activities on a regular and continuing basis. 20 C.F.R. § 404.1545(a)(1)-(3).

Normally, in meeting her burden on the fifth step, the Commissioner may rely on the Medical-Vocational Guidelines contained in 20 C.F.R. Part 404, Subpart P, Appendix 2, commonly referred to as "the Grid[s]."[90] Zorilla, 915 F. Supp. at 667.

_____

[90] "The Grid classifies work into five categories based on the exertional requirements of the different jobs." Andrews v. Colvin, 2014 WL 3630668, *16 n.7 (S.D.N.Y. July 22, 2014) (quoting Zorilla v. Chater, 915 F. Supp. 662, 667 n.2 (S.D.N.Y. 1996)). "Specifically, it divides work into

> When the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect only your ability to meet the strength demands of jobs . . ., we consider that you have only exertional limitations. When your impairment(s) and related symptoms only impose exertional limitations and your specific vocational profile is listed in a rule contained in appendix 2, we will directly apply that rule to decide whether you are disabled.[91]

20 C.F.R. § 416.969a(b). However, if a claimant suffers from significant non-exertional limitations, exclusive reliance on the Grids is inappropriate. See Butts v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004 (citing Rosa, 168 F.3d at 78); see also Feliciano v. Apfel, 242 F.3d 364, *1, 2000 WL 1775513, *1 (2d Cir. 2000); Lugo v. Colvin, 2014 WL 5045630, *1 (S.D.N.Y. Oct. 9, 2014).

The Second Circuit has consistently emphasized the importance of the Commissioner's burden to support her step-five determination with substantial evidence, and has held that a

---

sedentary, light, medium, heavy, and very heavy, based on the extent of the requirements in the primary strength activities of sitting, standing, walking, lifting, carrying, pushing, and pulling." Id. Based on these factors, the SSA uses the Grids to evaluate whether the claimant can engage in any other substantial gainful work that exists in the economy. Zorilla, 915 F. Supp. at 667.

91 "Limitations are classified as exertional if they affect your ability to meet the strength demands of jobs. The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertional levels (sedentary, light, medium, heavy, and very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling." 20 C.F.R. § 416.969a(a). All other limitations are considered non-exertional. See, e.g., Rosa v. Callahan, 168 F.3d 72, 78 n.2 (2d Cir. 1999); Samuels v. Barnhart, 2003 WL 21108321, *11 n.14 (S.D.N.Y. May 14, 2003) (quoting 20 C.F.R. § 416.969a(a)); see also 20 C.F.R. § 404.1569a(c).

reversal with a remand only to calculate damages is warranted when the ALJ has failed to meet that burden. Curry v. Apfel, 209 F.3d 117, 124 (2d Cir. 2000) (holding that no purpose would be served by remanding the case for rehearing where the ALJ's finding of the claimant's RFC was not supported by substantial evidence); Rosa, 168 F.3d at 80-81 (holding that the ALJ could not rely on consulting expert reports when those reports were silent on the subject of the claimant's exertional capability, and therefore remanding for benefit calculations); Balsamo v. Chater, 142 F.3d 75, 82 (2d Cir. 1998) (remanding an appeal for calculation of benefits because the record did not support the ALJ's RFC determination and finding it unlikely that the Commissioner could produce new and material evidence, or could show good cause for having failed to produce substantial evidence in the original proceeding); Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 643-44 (2d Cir. 1983) (holding that a rehearing was not needed when the failure to sustain the burden at step five is the sole reason for remand, that four years had elapsed since the claimant applied for benefits, and that a rehearing would only delay the benefits likely due to the claimant). Nonetheless, remanding only for benefits calculation "is an extraordinary action and is proper only when further development of the record would serve no purpose." Baldwin v.

Astrue, 2009 WL 4931363, *19 (S.D.N.Y. Dec. 21, 2009) (citing Rivera v. Barnhart, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005)).

IV.   The ALJ's Decision

On January 17, 2013, ALJ Gonzalez issued his decision, finding that Mr. Cabreja was not disabled within the meaning of the Act. (Tr. 16-27).

At step one, the ALJ determined that plaintiff had not engaged in substantial gainful activity since the alleged onset date of his disability, November 7, 2007. (Id. at 18). He also determined that plaintiff's last insured date was December 31, 2012. (Id.).

At step two, the ALJ determined that plaintiff had severe impairments consisting of a history of lumbar fusion and right-knee arthroscopy secondary to a stress fracture of the tibial plateau. (Id. at 18). The ALJ acknowledged that plaintiff testified to "feel[ing] sad," that he had reported to Dr. Weinberger that he suffered from "poor sleep, increased appetite, sadness, and apprehension," and that his "[a]ffect appeared depressed and mood dysthymic." (Id. at 18, 20).

Nevertheless, ALJ Katz concluded that "claimant's medically determinable mental impairments of depression and anxiety do not cause more than minimal limitations in claimant's ability to perform basic mental activities, and is therefore non-severe." (Id. at 20). The ALJ supported his position on plaintiff's mental status with the examination notes of Dr. Weinberger and Dr. Hoffman, who the ALJ determined were "entitled to great weight, based upon their expertise in psychiatry and experience as program doctors." (Id. at 20-21). The ALJ noted that Dr. Weinberger "made no diagnosis, finding that the claimant's examination was consistent with stress-related problems," further stating that plaintiff's "stress-related condition did not appear to significantly affect the claimant's ability to function on a daily basis" and that, at the appointment with Dr. Weinberger, plaintiff's "thoughts were coherent and goal directed" and his "[a]ttention, concentration, and memory were intact." (Id. at 20). The ALJ also cited Dr. Hoffman's report, in which Dr. Hoffman determined that there was "no medically determinable psychiatric impairment." (Id.). Further, the ALJ noted that plaintiff "undergoes no psychiatric treatment or counseling." (Id.).[92] Based on these factors, the ALJ found no

---

[92] In his testimony, plaintiff testified that he did not receive any treatment or medication for his depression, but ascribed that fact to his lack of medical insurance. (Tr. 58-59). When asked whether he would see a doctor for his depression if he had insurance, plaintiff responded, "of

evidence "of a severe mental impairment, as contemplated by 20 CFR 404.1521." (Id.).

The ALJ also evaluated plaintiff's mental impairments by applying the four broad functional areas known as the "paragraph B" criteria.[93] (Id. at 20-22). In the first area of "daily living," the ALJ determined that plaintiff had a "mild limitation," as the ALJ noted that plaintiff had "reported that his daily activities are limited by physical restrictions, not mental ones" and had "admitted [to Dr. Weinberger] that he experiences no more than mild depression and anxiety." (Id. at 21). The ALJ pointed out that plaintiff is unable to cook,

---

course." (Id. at 59). Also at the hearing, it was revealed that medical treatment for plaintiff's depression was not being covered by Worker's Compensation because plaintiff does not have any evidence that his depression resulted from his accident. (Id. at 58).

[93] In order to decide whether a claimant's mental impairment meets the criteria for disability, the ALJ must determine that his condition includes at least one of the specific symptoms for a "paragraph A" mental disorder ("Paragraph A" includes the following disorders: "[o]rganic mental disorders (12.02); schizophrenic, paranoid and other psychotic disorders (12.03); affective disorders (12.04); intellectual disability (12.05); anxiety-related disorders (12.06); somatoform disorders (12.07); personality disorders (12.08); substance addiction disorders (12.09); and autistic disorder and other pervasive developmental disorders (12.10).").

Paragraph B requires the impairment to result in at least two of the following: "(1) Marked restriction of activities of daily living; or (2) Marked difficulties in maintaining social functioning; or (3) Marked difficulties in maintaining concentration, persistence, or pace; or (4) Repeated episodes of decompensation, each of extended duration." Appendix 1, Listing 12.04(B). Alternatively, claimants alleging organic mental disorders, affective disorders, or anxiety related disorders can demonstrate that they meet the "paragraph A" symptoms and one of the "paragraph C" criteria instead of "paragraph B." Paragraph C requires a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support," and one of three additional criteria. Appendix 1, Listing 12.04(C).

clean, or do laundry due to his back injury, but was able to manage his own funds and shop once per week. (Id.).[94] The ALJ further cited Dr. Weinberger's determination that Mr. Cabreja was "able to understand and execute simple instructions, perform simple tasks independently, maintain a schedule, make appropriate decisions, and appropriately deal with stress." (Id.). As such, the ALJ concluded that plaintiff suffered no more than "mild functional limitations" in daily living, a finding bolstered by "Dr. Hoffman f[inding] no evidence of any medically determinable impairment." (Id.).

In the area of "social functioning," the ALJ determined that Mr. Cabreja had a "mild limitation." (Id. at 21). The ALJ noted that plaintiff lives with his brother and has two adult children, and that during examinations his niece would accompany him for the purposes of interpretation. (Id.). Additionally, the ALJ called attention to the fact that Mr. Cabreja, at the time of the hearing, was attending an English class once per week. (Id.). Citing these facts, the ALJ found that "there is no indication that the claimant has difficulty interacting with family members or has difficulty interacting with those in his English class." (Id.). Furthermore, the ALJ cited Dr.

---

[94] In Dr. Weinberger's report, it was also noted that plaintiff was not driving at the time of the exam. (Tr. 339).

Weinberger's exam notes regarding plaintiff's mental status,[95] and added that there is no evidence that plaintiff "is subject to legal entanglements or has ever exhibited untoward behavior." (Id.). With the above in mind, the ALJ found "no more than a mild deficit in social functioning." (Id.).

Next, the ALJ found that plaintiff had a "mild limitation" in the functional area of "concentration, persistence, or pace." (Id.). The ALJ acknowledged that at the hearing, plaintiff testified that he suffers from some memory difficulties; however, the ALJ noted plaintiff's examination by Dr. Weinberger, from which the doctor determined that plaintiff's "attention, concentration, and memory" were all "intact." (Id.). To further support his point, the ALJ noted that plaintiff's continued attendance at English classes "necessarily require[s] some measure of concentration." (Id.). Therefore, the ALJ found evidence "of only mild deficits" in this functional area. (Id.).

In the last functional area, decompensation, the ALJ determined that plaintiff had "no limitation," as plaintiff has never experienced an episode of decompensation, and there is no evidence that plaintiff experienced decompensation in a work

---

[95] As noted by the ALJ (Tr. 21), Dr. Weinberger indicated that plaintiff "was cooperative and adequately related." (Id. at 339).

setting. (Id.). To conclude, the ALJ reiterated that plaintiff's medically determinable mental impairment is not severe because it "causes no more than 'mild' limitation in any of the first three functional areas and 'no' limitation in the fourth area." (Id.).[96]

At step three, the ALJ determined that neither of the severe impairments nor a combination of the impairments met or equaled any of the listed impairments in per se disability listings in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id. at 22). The ALJ noted plaintiff's history of disc herniation, which required spinal-fusion surgery. (Id.). However, the ALJ reasoned that plaintiff displayed "no signs of any neurological deficit," which he supported with Dr. Pelczar-Wissner's notes from December 2011 that stated "Neurologic: . . . No sensory deficit noted. Strength 5/5 in upper and lower extremities." (Id. at 22, 344). Therefore, the ALJ concluded, there was no evidence of musculoskeletal impairment that matched the severity found in the listing regulations. (Id.).

---

[96] Concluding the section on his assessment of the severity of plaintiff's asserted mental impairment, ALJ Katz added that he has also "translated the above 'B' criteria findings into work-related functions in the residual functional capacity assessment below" (Tr. 22) and averred that "[i]n making [the RFC] finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be expected as consistent with the objective medical evidence and other evidence." (Id. at 23).

Before moving on to step four, the ALJ utilized a two-step process to determine plaintiff's RFC. (Id. at 22-26). He first determined whether there was an "underlying medically determinable physical or mental impairment . . . that can be shown by medically acceptable clinical and laboratory diagnostic techniques [] that could reasonably be expected to produce the claimant's pain and other symptoms," and then he made credibility findings regarding any evidence of pain or symptoms that exceeded the expectations arising from this objective medical evidence. (Id. at 23).

At step one, the ALJ reiterated his position that despite plaintiff's history of disc herniation, requiring spinal fusion, plaintiff "displays no ongoing neurological deficits." (Id.). To that effect, the ALJ cited Dr. Liu's reports, which indicated that plaintiff's "sensation and motor functioning remain intact," Dr. Carniciu's 2011 report, which noted that plaintiff displayed "no motor deficit or focal loss of normal reflexes and sensation," and Dr. Pelzcar-Wissner's determination that plaintiff exhibited "5/5 strength with normal reflexes and sensation." (Id.). The ALJ also included findings from Dr. Simon's 2011 exam, at which he found that plaintiff was capable of flexing his lumbar spine to 90 degrees, had no evidence of

muscle spasm, and a negative straight-leg-raising test. (Id.).
Regarding plaintiff's knee, the ALJ found that the tibial
plateau fracture has "fully healed," which he supported with
notes from Dr. Carton's exam conducted April 21, 2009, from
which Dr. Carton noted "no signs of instability." (Id.).

The ALJ also cited Dr. Simon's "moderate Worker's
Compensation disability rating" and advisement to avoid
"prolonged sitting and standing, which exceeds four hours per
day" and to avoid lifting more than 25 pounds.[97] (Id. at 22). The
ALJ also supported his RFC determination with Dr. Carton's
August 2009 determination -- as described by the ALJ -- that
plaintiff was capable of "sedentary work,"[98] and Dr. Pelczar-
Wissner's conclusion -- again, as described by the ALJ -- that
plaintiff "has a moderately limited ability to walk and a
markedly limited ability to engage in heavy lifting and

---

[97] The ALJ added that the occupational base of sedentary work will not
be eroded where the individual who requires the ability to alternate sitting
and standing can be accommodated through scheduled breaks and a lunch period
(citing to SSR 96-9). (Tr. 22). The ALJ also explained that plaintiff's prior
work as a machine operator was particularly well-suited to this type of
arrangement because, at the hearing, plaintiff "repeatedly reported that he
was able to sit and stand at will when performing his basic work activities."
(Id.; see also id. at 35, 49).
[98] Dr. Carton's full recommendation was "sedentary activity only with
the avoidance of any attempts at lifting, bending, squatting, kneeling,
crawling, [and] climbing." (Tr. 253).

carrying."[99] (Id.).

Ultimately, the ALJ assigned "little weight" to the findings of Dr. Mitamura and Dr. Liu, and assigned "no weight" to Dr. Robbins's evidence. (Id. at 25-26). The ALJ concluded that Dr. Mitamura's "opinion is unsupported by his own examinations and is inconsistent with the findings of Dr. Pelczar-Wissner and Dr. Simon." (Id.). The ALJ found particular fault with Dr. Mitamura's opinion of disability while also "not[ing] on clinical examinations that the claimant is neurologically intact with normal motor functioning, reflexes, and sensation." (Id. at 25). The ALJ determined that Dr. Liu's June 2011 opinion that plaintiff could not work was entitled to "little weight," because it was inconsistent with Dr. Liu's own clinical findings, as well as with reports of "other physicians" who were treating plaintiff. (Id. at 26). According to the ALJ, "[t]he claimant's condition progressively improved following his first visit to Dr. Liu in July 2008." (Id.). The ALJ gave Dr. Robbins "no weight," because, according to the ALJ, Dr. Robbins stated that plaintiff was "totally disabled from work" without any evidence to support his conclusion and did not identify any specific functional restrictions. (Id.). Moreover, the ALJ held

_____

[99] The ALJ omitted Dr. Pelczar-Wissner's opinion that plaintiff also had a "[m]arked restriction for bending." (Tr. 344).

that Dr. Robbins' opinion was inconsistent with the opinion of Dr. Simon and Dr. Pelczar-Wissner, and therefore not "entitled to any probative value." (Id.).

ALJ Gonzalez gave "great weight" to the opinions of Dr. Simon and Dr. Pelczar-Wissner. (Id. at 25). He found that their opinions supported the RFC that he defined for plaintiff[100] and were consistent with each other's, as well as the "other physicians" involved in plaintiff's healthcare and the medical and clinical evidence. (Id.). Dr. Carton received "slight weight" from the ALJ, who explained that despite Dr. Carton's multiple examinations, the ALJ determined that his opinions varied and were inconsistent with plaintiff's daily living activities. (Id.).[101]

Second, in evaluating plaintiff's symptoms, the ALJ acknowledged plaintiff's report that his ability to sit, stand, walk, and lift for periods of time is "markedly limited," that

---

[100] The ALJ noted that Dr. Pelczar-Wissner had found no neurological deficits and "noted that the claimant has a moderately limited ability to walk and a markedly limited ability to engage in heavy lifting." (Tr. 25). The ALJ referenced Dr. Simon's "assign[ment of] a Workers' Compensation disability rating of moderate" and his opinion that plaintiff "should lift no more than 25 pounds and should avoid prolonged periods of sitting or standing, not to exceed four hours." (Id.). The ALJ again refrained from mentioning Dr. Pelczar-Wissner's opinion that plaintiff also had a "[m]arked restriction for bending." (Tr. 344).

[101] The ALJ also noted that Dr. Carton "has consistently found that the claimant is capable of sedentary work." (Tr. 25).

61

"he experiences continual back pain, which is exacerbated by prolonged periods of standing," and that he suffers from pain in the hip and right knee. (Id. at 24). The ALJ also noted plaintiff's testimony that neither the back surgery nor the multiple pain injections were particularly effective in the long term. (Id.).[102] The ALJ also acknowledged that Mr. Cabreja had stopped taking Hydrocodone for a period of time due to its side effects (id.); however, to support his contention that plaintiff's limitations were less severe than his testimony indicated, the ALJ asserted that if plaintiff had been suffering from back pain to the extent that he alleged, he would not have stopped taking the Hydrocodone, as was noted in his medical records and testimony. (Id. at 24-25).

The ALJ found that there was little support for Mr. Cabreja's subjective complaints and alleged limitations. (Id. at 24). He reasoned that plaintiff was able to sit for, and pass, his United States citizenship exam in 2009, despite the "significant functional restrictions" that he reported. (Id.). The ALJ further questioned Mr. Cabreja's claim of a limited ability to sit for prolonged periods of time, citing the English classes that he took once per week in preparation for his exam,

---

[102] The ALJ did note that plaintiff "testified that, prior to surgery, he would lose control and fall down" and that "[t]hat has not happened since undergoing surgery." (Tr. 24).

and the English classes that he was taking at the time of the hearing, to and from both of which plaintiff walked one block. (Id.). The ALJ also questioned Mr. Cabreja's asserted sitting limitations because he was able to "tolerate" a three-hour plane ride to the Dominican Republic in 2007.[103] (Id.). Finally, the ALJ used the fact that plaintiff was receiving Worker's Compensation benefits to question his motivation for returning to work. (Id. at 25). In sum, the ALJ "does not find that the testimony given by the claimant at hearing is credible concerning his alleged functional limitations and complaints of pain[,] [a]lthough he does not doubt that the claimant may occasional experience some discomfort." (Id.).

Concluding this RFC analysis, the ALJ determined that plaintiff "had the residual functioning capacity to perform sedentary work,[104] except that [he] can occasionally kneel and crawl; can frequently crouch and stoop; should avoid

---

[103] The ALJ wrote that the plane ride took place in 2007, although a close read of the transcript of plaintiff's testimony reveals only that he flew to his father-in-law's funeral some time between November 2007 and his back surgery in May 2011. (Tr. 40-41, 59, 221-22).

[104] Under the relevant SSA regulation,

Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R § 404.1567(a).

concentrated exposure to respiratory irritants including gas, fumes, and dust[105]; and requires the option to sit or stand at will." (Id. at 22).

At step four, the ALJ concluded that, through the date last insured, based on plaintiff's residual functioning capacity, he was capable of performing his past relevant work as a machine operator. (Id. at 26). The ALJ determined that plaintiff's description of his machine operator job in his testimony was more accurate than what was stated in his work history report. (Id.).[106] Plaintiff testified that as a machine operator he had to pick up and place on a table small metal pieces that weighed no more than one ounce, and also that, as an operator, he had the ability to sit and stand at will. (Id.).[107]

Based on the finding that plaintiff could perform that past work, the ALJ found plaintiff not to be disabled. (Id. at 27).

---

[105] The ALJ made this "respiratory irritant" determination due to the fact that plaintiff reported a history of mild asthma, for which he was treated by the Emergency Department of St. John's Riverside Hospital in June 2011. (Tr. 23, 327-28). Plaintiff was prescribed Albuterol (id.), which is "often used in asthma treatment [and] . . . is a bronchodilator that relaxes muscles in the airways and increases air flow to the lungs." 3 Attorneys Medical Advisor § 30:14.

[106] See supra p. 4 n.3.

[107] It should be noted that plaintiff testified that he would not be able to perform his machine operator as he cannot "bend over too much now," and that the job "always" required him to perform such action (Tr. 50), testimony not addressed by ALJ Katz.

## ANALYSIS

I.  Standard of Review

When a claimant challenges the Social Security Administration's denial of disability benefits, a court may set aside the Commissioner's decision only if it is not supported by substantial evidence or was based on legal error. Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998) (citing Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam))); see 42 U.S.C. § 405(g) (stating that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

"Substantial evidence" is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004). The substantial-evidence test applies not only to the Commissioner's factual findings, but also to

65

inferences drawn from the facts. E.g., Carballo ex rel. Cortes v. Apfel, 34 F. Supp. 2d 208, 214 (S.D.N.Y. 1999). In determining whether substantial evidence exists, a reviewing court must consider the whole record, examining the evidence from both sides, because analyzing the substantiality of the evidence supporting the Commissioner's decision must also include assessing that which detracts from its weight. See, e.g., Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)); Williams ex rel. Williams, 859 F.2d at 258.

The Commissioner, not the court, must resolve evidentiary conflicts and appraise the credibility of witnesses, including the claimant. See, e.g., Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); Carroll, 705 F.2d at 642. However, "[i]n the absence of a medical opinion to support the ALJ's finding as to [a plaintiff]'s ability . . . , it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . .'" Balsamo, 142 F.3d at 81 (quoting McBrayer v. Sec'y of Health and Human Servs., 712 F.2d 795, 799 (2d Cir. 1983)).

66

While the ALJ need not resolve every conflict in the record, Miles v. Harris, 645 F.2d 122, 124 (2d Cir. 1981), "the crucial factors in any determination must be set forth with sufficient specificity to enable [a reviewing court] to decide whether the determination is supported by substantial evidence." Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984); cf. Snell v. Apfel, 177 F.3d 128, 134 (2d Cir. 1999) (holding that claimant was entitled to an explanation of why the Commissioner discredited her treating physician's disability opinion).

In addition to the consideration of the evidence in the record, a reviewing court must consider the ALJ's application of the law to the record before him. Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 422 (S.D.N.Y. 2010). The court "reviews de novo whether the correct legal principles were applied and whether the legal conclusions made by the [SSA] were based on those principles." Thomas v. Astrue, 674 F. Supp. 2d 507, 520 (S.D.N.Y. 2009).

Since disability-benefits proceedings are non-adversarial in nature, the ALJ has an affirmative obligation to develop a complete administrative record, even when the claimant is represented by counsel. See Lamay v. Comm'r of Soc. Sec., 562

F.3d 503, 508-09 (2d Cir. 2009); Casino-Ortiz v. Astrue, 2007 WL 2745704, *7 (S.D.N.Y. Sept. 21, 2007) (citing Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996)). To this end, the ALJ must make "every reasonable effort" to help an applicant get medical reports from her medical sources. 20 C.F.R. §§ 404.1512(d), 416.912(d). Ultimately, "[t]he record as a whole must be complete and detailed enough to allow the ALJ to determine the claimant's residual functional capacity." Casino-Ortiz, 2007 WL 2745704 at *7 (citing 20 C.F.R. § 404.1513(e)(1)-(3)). When there are inconsistencies, gaps or ambiguities in the record, the regulations lay out several options for the ALJ to collect evidence to resolve these issues, including re-contacting the treating physician, requesting additional records, arranging for a consultative examination, or seeking information from others. 20 C.F.R. §§ 404.1520b, 416.920b.[108] Despite the changes to this regulation in recent years, the animating principle behind the Commissioner's burden to clarify inconsistencies and ambiguities

---

[108] On March 26, 2012 the Commissioner eliminated the former regulation 20 C.F.R. §§ 404.1512(e), 416.912(e), thereby removing the mandate that the ALJ first contact the treating source to resolve conflicts and ambiguities in the record. How We Collect and Consider Evidence of Disability, 77 Fed. Reg. 10,651 (Feb. 23, 2012) (explaining the new regulations). The new regulation, 20 C.F.R. §§ 404.1520b, 416.920b, "significantly reduce[s]," but does not completely abandon, the need to re-contact a treating source and instead provides an ALJ with several options -- among them contacting the treating source -- to clarify portions of the evidence that are inconsistent or insufficient to allow for a determination of disability. Id.; see also Gabrielsen v. Colvin, 2015 WL 4597548, *6 (S.D.N.Y. July. 30, 2015) (discussing the implication of the new regulation for the Commissioner's burden to re-contact the treating source). Since the Commissioner's decision in this matter did not become final until after the new regulation went into effect, we apply this new regulation to our analysis.

in the record by seeking additional evidence remains "that a hearing on disability benefits is a non-adversarial proceeding." Vazquez v. Comm'r of Soc. Sec., 2015 WL 4562978, *17 n.32 (S.D.N.Y. July 21, 2015) (citing Perez, 77 F.3d at 47). Accordingly, "the alteration of the regulations does not give the ALJ free rein to dismiss an inconsistency without further developing the record." Id.

The ALJ must also adequately explain his reasoning in making the findings on which his ultimate decision rests, and in doing so, he must address all pertinent evidence. See, e.g., Diaz v. Shalala, 59 F.3d 307, 315 (2d Cir. 1995); Ferraris, 728 F.2d at 586-87; see also Allen ex rel. Allen v. Barnhart, 2006 WL 2255113, *10 (S.D.N.Y. Aug. 4, 2006) (finding that the ALJ explained his findings with "sufficient specificity" and cited specific reasons for his decision). An ALJ's "'failure to acknowledge relevant evidence or to explain its implicit rejection is plain error.'" Kuleszo v. Barnhart, 232 F. Supp. 2d 44, 57 (W.D.N.Y. 2002) (quoting Pagan v. Chater, 923 F. Supp. 547, 556 (S.D.N.Y. 1996)); see also Corporan v. Comm'r of Soc. Sec., 2015 WL 321832, *5 (S.D.N.Y. Jan. 23, 2015).

The Social Security Act authorizes a court, when reviewing decisions of the SSA, to order further proceedings. As expressly stated: "The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g); Butts, 388 F.3d at 382. If "'there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" the court will remand the case for further development of the evidence or for more specific findings. Rosa, 168 F.3d at 82-83 (quoting Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996)). Remand is particularly appropriate where further findings or explanation will clarify the rationale for the ALJ's decision. Pratts, 94 F.3d at 39. If, however, the reviewing court concludes that an ALJ's determination to deny benefits was not supported by substantial evidence, a remand solely for calculation of benefits may be appropriate. See, e.g., Butts, 388 F.3d at 386 (discussing Curry, 209 F.3d at 124).

II.   The Parties' Motions

a. Plaintiff's Arguments

Plaintiff argues that the ALJ's determination that he was not disabled should be reversed, or else that the case should be remanded back to the SSA. (Pl.'s Mem. 2-4). In sum, plaintiff asserts that "[t]he Administrative Law Judge improperly applies greater weight to consultative physicians than to treating physicians, contrary to both the statute and the case law." (Id. at 2).

Plaintiff first points out that both Drs. Mitamura and Liu found plaintiff to be disabled. (Id.). Plaintiff further notes that, while the ALJ gave Dr. Pelzcar-Wissner's opinion great weight, she was a consulting internist for the SSA, as opposed to Dr. Mitamura, who is a board-certified orthopedic surgeon, and Dr. Liu, who is a specialist in rehabilitation and physical medicine. (Id.). Plaintiff also raises the fact that Drs. Mitamura and Liu had "lengthy relationship[s]" with plaintiff, as opposed to Dr. Pelzcar-Wissner, who "examined the plaintiff **ONLY ONCE**." (Id. at 2-3 (emphasis in original)).

71

Plaintiff also takes issue with the great weight afforded to the opinion of Dr. Simon, who, as noted by plaintiff, conducted an examination on behalf of "AN ADVERSARY," that is, plaintiff's insurance company, which was disputing his workers' compensation claim. (Id. at 3). Finally, plaintiff argues that the "no weight" assigned to the opinion of Dr. Robbins was also error, in that his statements were consistent with the other two treating physicians, Drs. Mitamura and Liu. (Id. at 3-4). Ultimately, plaintiff points out that "the three treating sources are all consistent while the two doctors who examined the plaintiff for adversarial purposes differ." (Id. at 4).

b. Defendant's Arguments

Defendant asserts that substantial evidence supports the ALJ's findings. (Def.'s Mem. 14-20). According to defendant, the ALJ's determination that plaintiff had the residual functioning capacity for sedentary work with certain restrictions is substantially supported by medical evidence, including the results of various range-of-motion tests, diagnostic examinations, and the opinions of Drs. Simon, Pelzcar-Wissner, and Carton. (Id. at 14-16).

Defendant further argues that the ALJ properly evaluated the opinions of plaintiff's treating physicians, Drs. Mitamura, Liu, and Robbins. (Id. at 16-18). The ALJ determined that their opinions were not entitled to "controlling weight," given the contradictory medical evidence contained in their own records and elsewhere. (Id.). Finally, defendant asserts that the ALJ permissibly found that plaintiff's subjective complaints were not credible, as they were not supported by the medical evidence and plaintiff's statements. (Id. at 18-20). Defendant calls particular attention to plaintiff's testimony "that he used narcotic pain medication on a consistent basis since 2009," and asserts that "his reports to physicians did not support this claim." (Id. at 19). Accordingly, defendant asks that the Commissioner's determination be affirmed. (Id. at 20).

III.   Assessment of the Record

We assess the record and conclude that the ALJ's decision suffers from at least five types of error, each of which justifies a remand for further development of the record and for findings supported by substantial evidence.

a. The ALJ Failed to Acquire Complete Evidence

The ALJ bears the burden of ensuring that the record as a whole is "complete and detailed enough" to support his determinations. 20 C.F.R. §§ 404.1513(e)(1)-(3), 416.913(e)(1)-(3). This is a necessary predicate to the obligation to resolve inconsistencies and ambiguities in the record. Id. at §§ 404.1520b, 416.920b. Indeed, an ALJ commits legal error when he rejects a medical assessment without having first sought to develop fully the factual record. See Selian v. Astrue, 708 F.3d 409, 421 (2d Cir. 2013) (citing 20 C.F.R. § 404.1520b(c)(1)) (holding that in the face of "remarkably vague" evidence from the treating physician, "[a]t a minimum, the ALJ likely should have contacted [the treating physician] and sought clarification of his report"); see also Rosa, 168 F.3d at 80. The ALJ may even be required to develop the claimant's medical history for a period longer than the twelve-month period prior to the date on which the claimant filed if there is reason to believe that such information is necessary to reach a decision. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1512(d); 416.912(d); see Hilsdorf v. Comm'r of Soc. Sec., 724 F. Supp. 2d 330, 343 (E.D.N.Y. 2010); see also Pino v. Astrue, 2010 WL 5904110, *18 (S.D.N.Y. Feb. 8, 2010).

74

When the evidence in a claimant's record is inadequate for the SSA to make a determination, the ALJ "will determine the best way to resolve the inconsistency or insufficiency," and the actions taken "will depend on the nature of the inconsistency or insufficiency." 20 C.F.R. §§ 404.1520b(c), 416.920b(c). In evaluating this regulation, courts in this Circuit have held that when the information needed pertains to the treating physician's opinion, the ALJ should reach out to that treating source for clarification and additional evidence. Selian, 708 F.3d at 421; Gabrielsen, 2015 WL 4597548 at *6 (holding "that, in some cases, the nature of the record may render re-contacting the treating physician the best, if not the only, way to address gaps or inconsistencies in the record, such that it is incumbent upon the ALJ to do so"); Reynoso v. Colvin, 2015 WL 1378902, *13 (S.D.N.Y. Mar. 26, 2015) (citing Cancel v. Colvin, 2015 WL 865479, *4-5 (S.D.N.Y. Mar. 2, 2015); Jimenez v. Astrue, 2013 WL 4400533, *11 (S.D.N.Y. Aug. 14, 2013)).

In this case, ALJ Gonzalez erred by not attempting to gather additional information in order to clear up any purported internal inconsistencies in doctors' reports and by failing to fully develop the record in terms of missing reports and potential test results. These errors alone justify remand.

Regarding inconsistencies in the record, the ALJ argued that the opinions of Drs. Mitmaura, Liu, and Robbins were unsupported by their own examinations and/or had no evidence to support their conclusions. (E.g., Tr. 25-26). According to the ALJ, Dr. Mitamura submitted multiple C-4.2 Worker's Compensation Board forms stating that Mr. Cabreja was totally disabled and unable to work, despite the fact that he had stated in clinical notes that plaintiff was neurologically intact and had normal motor functioning, reflexes, and sensation. (Id.). Similarly the ALJ reasoned that Dr. Liu's determination of Mr. Cabreja's inability to work was contrary to the fact that his "condition progressively improved" following his first visit in July 2008, as Dr. Liu reported plaintiff having had negative straight-leg-raising tests and no gait disturbances, and that the injections had alleviated pain for up to five months. (Id. at 26). As for Dr. Robbins, the ALJ argued that the doctor was not entitled to "any weight," because (1) his determination that plaintiff was disabled was unsupported by evidence and (2) Dr. Robbins did not state any specific functional restrictions. (Id.). The ALJ also dismissed these doctors' opinions in light of the contrary of opinions of Drs. Simon and Pelczar-Wissner. (Id. at 25-26).

In all three cases, a few select segments of the record

76

support the ALJ's sense that the doctors' reports, in certain respects, may be in tension with their concluding opinions of disability. But see, e.g., infra pp. 89-90 (noting the ALJ's selective and misleading treatment of Dr. Mitamura's records), 93-94 (same for Dr. Liu). However, the ALJ erred by failing to seek clarification from these treating physicians when he perceived an inconsistency in the medical records. The SSA regulations require the ALJ to make further inquiries when he finds gaps or conflicts in the evidence provided by treating physicians. 20 C.F.R. §§ 404.1520b, 416.920b. The ALJ has a responsibility to "fill any clear gaps" if it is believed that a treating physician's report lacks support. Burgess, 537 F.3d at 129 (quoting Rosa, 168 F.3d at 79). Simply put, the ALJ has the burden to seek out and complete the medical evidence before dismissing a physician's medical assessment, see 20 C.F.R. § 404.1512(d), and thus the ALJ had a responsibility to seek clarification from these treating physicians before discounting their opinions as inconsistent or internally contradictory.

Furthermore, there are several specific gaps in the record concerning which the ALJ also had a responsibility to inquire. First, for example, ALJ Gonzalez did not inquire into whether the EMG nerve testing, MRIs, and facet blocks that Dr. Mitamura

77

recommended to plaintiff in his 2012 exam reports were ever completed and if so, what were the results. (Tr. 380, 383, 388, 392). As late as September 2012, Dr. Mitamura was recommending EMG nerve testing and in March of that year, he wrote that "[i]f the patient does not improve then again we need to obtain an MRI and possibly consider revision surgery." (Id. at 380, 392). Since these recommendations were the most recent in plaintiff's healthcare history and were made by a treating physician, the test results stemming from Dr. Mitamura's recommendations, if in existence, need to be retrieved and evaluated. The fact that the ALJ did not inquire whether these tests were done and what the results may have been further compels the need for a remand, since he discredited Dr. Mitamura's opinion, at least in part, for purported lack of support.[109]

Furthermore, as noted, see supra p. 13 n.18, the records from Drs. Carton and Simon reveal the existence of numerous examination records and reports from Dr. Mitamura that are not themselves contained in the record, five dating from 2007, eight from 2008, two from 2009, and five from 2011. (Tr. 256, 260, 264, 267, 373). While only a portion of these missing records speak directly to Mr. Cabreja's condition in the year preceding

---

[109] There are other missing test records as well, including (1) the November 14, 2007 MRI (see Tr. 264, 272), (2) the June 2008 MRI (see id. at 253, 260, 311), and (3) the July 2012 x-rays. (See id. at 383).

the filing of his application for benefits, see 20 C.F.R. §
404.1512, they were still considered by Drs. Simon and Carton
during their file reviews, which they used in part to form their
opinions, and which the ALJ used as part of his decision.
Inquiry into these records is especially important given the
"great weight" afforded to Dr. Simon's opinion. (See id. at 25).
The missing documents would also help to fill some of the large
gaps in Mr. Cabreja's treatment history, especially for Dr.
Mitamura's portion of the record.

Moreover, SSA regulations require the ALJ to develop the
record for at least the 12 months preceding the month in which
the application is filed, "unless there is a reason to believe
that development of an earlier period is necessary." 20 C.F.R. §
404.1512 (emphasis added). While that necessity is for the
Commissioner to decide, the ALJ made his decision seemingly with
full knowledge that these records were missing and without any
evident attempt to gather them. Upon remand, in addition to
seeking complete records for the period of one year prior to the
alleged onset of disability through the most recent treatments
by the physicians in the record, the Commissioner should also
consider the value of seeking the missing records listed in Dr.
Carton's and Dr. Simon's exam notes to aid her determination.

In a similar vein we note the likely absence of extant records from Dr. Liu. As mentioned, see supra pp. 24-25 n.55, while the administrative record includes examination and treatment reports from 2008 through the middle of 2011 (Tr. 275-312), mid-2012 records reflect a continuing relationship between Dr. Liu and plaintiff well beyond 2011. (See id. at 383-85). Dr. Liu filled out a report to the Workers Compensation Board that noted a May 2012 examination and, in July 2012, Dr. Mitamura observed that plaintiff "also is receiving injection treatments with Dr. Liu." (Id. at 383). Given Dr. Liu's status as a treating physician, the "little weight" nevertheless assigned to his findings, and the ALJ's characterization that "[t]he claimant's condition progressively improved following his first visit to Dr. Liu in July 2008" (id. at 25-26), on remand, the ALJ should at least inquire about the possible existence of records from Dr. Liu dating to after mid-2011 and request the missing records, if any.

We also observe that a number of records relating to Dr. Robbins -- yet another discounted treating physician -- are similarly missing. The ALJ gives Dr. Robbins no weight, citing the lack of support for Dr. Robbins' December 2009, June 2010, and November 2010 findings of total disability. (Id. at 26).

However, the ALJ appears to have made his determination based only on a portion of the records from Dr. Robbins. While we have before us reports following exams dated December 15, 2009 (id. at 250), June 23, 2010 (id. at 249), November 11, 2010 (id. at 248), February 16, 2011 (id. at 245), and April 19, 2001 (id. at 242), Dr. Carton references other of Dr. Robbins's records and examinations dated to February 12, 2009 (id. at 257) and May 28, 2009. (Id. at 252). Additionally, in a form labeled "Explanation of Determination" from the SSA, the agency also notes that "[t]he State agency that decided your claim had . . . John B Robbins MD, report of 10/19/11" (id. at 73), which itself does not appear in the record. The ALJ must endeavor to develop the record with respect to Dr. Robbins as well.

We finally note that there are no physical therapy reports in the record, even though the file review sections of Dr. Carton's and Dr. Simon's notes mention the existence of such records, and all of Mr. Cabreja's doctors -- treating and consultative -- remark upon plaintiff's participation in physical therapy. We infer from the various references that Mr. Cabreja had physical therapy from early 2008 through 2012 (see, e.g., id. at 263, 266, 278, 280, 286, 312, 380, 385), with a possible break starting in May 2011, which was when he had his

lumbar surgery. See also supra pp. 17-18 n.36. Despite this reality, the record does not contain a single report regarding his progress. There are only offhanded references to physical therapy in the ALJ's decision (see Tr. 19-20) and there is no indication that the ALJ sought out plaintiff's physical therapy records.

While a physical therapist is not considered an "acceptable medical source," the SSA will, under 20 C.F.R. §§ 404.1513(d), 416.913(d), use evidence from such sources "to show the severity of [the claimant's] impairment(s) and how it affects [the claimant's] ability to function." Id.; see also SSR 06-03. The evidence from "other sources," such as the physical therapists who treated Mr. Cabreja, cannot establish the existence of a medically determinable impairment -- only an "an acceptable medical source" such as Dr. Mitamura could do that -- but they can provide insight, "based on the special knowledge of the individual," that they have acquired through their treatment. SSR 06-03. Indeed, courts have reviewed and remanded ALJ decisions for failing to consider the evidence provided by "other sources." See, e.g., Baron v. Astrue, 2013 WL 1245455, *26 (S.D.N.Y. Mar. 4, 2013) report and recommendation adopted, 2013 WL 1364138 (S.D.N.Y. Mar. 26, 2013) (listing cases

supporting the court's power to find error when ALJs had not given appropriate weight to social workers, nurse practitioners, and similar "other source" evidence). The Commissioner should seek evidence related to plaintiff's physical therapy because it features prominently in the record as an instrumental remedy for Mr. Cabreja's injury.

The lack of development in the record regarding missing evidence and the fact that the ALJ did not attempt to resolve any of the inconsistencies justifies a remand, at which time the Commissioner should seek out all missing evidence, and request explanations regarding any inconsistencies in diagnosis or patient presentation, and then evaluate the evidence fully.

### b. The ALJ Failed to Follow the Treating Physician Rule

Apart from the ALJ's failure to develop the record, his analysis also fails to comply with the treating-physician rule. Social Security regulations and Second Circuit precedent generally require the ALJ to place presumptive weight on the opinions of treating physicians:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to

> the medical evidence that cannot be obtained from
> the objective medical findings alone or from reports
> of individual examinations, such as consultative
> examinations or brief hospitalizations.

20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). "[T]he opinion of a claimant's treating physician as to the nature and severity of the impairment is given 'controlling weight' so long as it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'" Burgess, 537 F.3d at 128 (internal citations omitted). Among such medically acceptable techniques, "[a] patient's report of complaints, or history, is an essential diagnostic tool." Green-Younger v. Barnhart, 335 F.3d 99, 107 (2d Cir. 2003) (quoting Flanery v. Chater, 112 F.3d 346, 350 (8th Cir. 1997)).

A treating physician is defined as a claimant's "own physician, psychologist, or other acceptable medical source who provides [a claimant] . . . with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." Tarsia v. Astrue, 416 F. App'x 16, 18 (2d Cir. 2011) (quoting 20 C.F.R. § 404.1502); see also Brickhouse v. Astrue, 331 F. App'x 875, 877 (2d Cir. 2009).

Typically, the treating physician's opinion is not afforded controlling weight if it is inconsistent with the other medical experts' opinions or not otherwise supported by record evidence. Burgess, 537 F.3d at 128; Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004); Snell, 177 F.3d at 133. "[A]nd the report of a consultative physician may constitute such evidence." Marquez v. Colvin, 2013 WL 5568718, *12 (S.D.N.Y. Oct. 9, 2013) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir.1983)). "However, not all expert opinions rise to the level of evidence that is sufficiently substantial to undermine the opinion of the treating physician." Burgess, 537 F.3d at 128. For example, the Second Circuit has held that "an expert's opinion [is] not substantial . . . where the expert . . . giv[es] an opinion couched in terms so vague as to render it useless in evaluating the claimant's residual functional capacity." Id. at 129 (internal quotations omitted).

If an ALJ does not afford the treating physician's opinion controlling weight, he must provide "good reasons" for declining to do so, as well as "good reasons" for according those opinions whatever weight he assigns to them. Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) ("We will always give good reasons

85

in our notice of determination or decision for the weight we give your treating source's opinion."). Key factors that the ALJ "must consider" include:

> (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion.

Halloran, 362 F.3d at 32; accord Clark, 143 F.3d at 118. Moreover, the ALJ may not simply rest on the inadequacy of a treating physician's report to deny that report controlling weight. The Second Circuit has held that "the lack of specific clinical findings in the treating physician's report did not, standing by itself, justify the ALJ's failure to credit the physician's opinion." Clark, 143 F.3d at 118. Instead, "it was the ALJ's duty to seek additional information from [the treating physician] sua sponte." Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998) (citing Perez, 77 F.3d at 47).

Finally, the Commissioner reserves the authority to issue the opinion on whether a claimant is "disabled." Therefore, neither a treating physician's opinion nor that of a

consultative physician is controlling on such determinations. 20
C.F.R. §§ 404.1527(d), 416.927(d).

Here, in addition to not having sought out additional
information to resolve inconsistencies and complete records from
plaintiff's treating physicians, the ALJ then compounded that
mistake by failing to abide by the treating-physician rule.
According to the ALJ, the opinions of Dr. Mitamura, Dr. Liu, and
Dr. Robbins were not entitled to controlling weight based in
part on internal inconsistencies as well as their inconsistency
with the opinions of consultative examiners Dr. Simon and Dr.
Pelczar-Wissner, to whose views he gave "great weight." (Tr. 25-
26).

### i. Dr. Mitamura

In his decision, the ALJ gave Dr. Mitamura's opinion
"little weight" and determined that it was not entitled to
significant probative value, asserting that Dr. Mitamura's
opinion was unsupported by his own clinical notes and
inconsistent with the opinions of Dr. Pelczar-Wissner and Dr.
Simon. (Id.). This decision to deny Dr. Mitamura controlling
weight was an error.

87

Dr. Mitamura was of course's plaintiff's treating physician. See supra pp. 13-24. He performed both of plaintiff's surgeries (Tr. 264, 245, 221-22) and examined plaintiff numerous times from 2007 through 2012, see supra p. 13 n.18, although, again, many of these records are missing. It certainly cannot reasonably be disputed that the record reflects an in-depth treatment relationship between plaintiff and Dr. Mitamura. Moreover, Dr. Mitamura's specialty is in orthopedic surgery (see Tr. 388), which is centrally relevant to Mr. Cabreja's injuries, much more so than Dr. Pelczar-Wissner's status as an internist. (See id. at 342-45). The ALJ did not address either of these facts in his decision.

Considering the relevant factors, ALJ Gonzalez did not provide good reasons when he denied Dr. Mitamura's findings controlling weight and thus erred when he gave Dr. Mitmaura "little weight." (Id. at 25-26). As noted, according to the ALJ, Dr. Mitamura's exam notes did not support his own opinion and his opinion was inconsistent with those of consultative examiners Drs. Pelczar-Wissner and Simon. (Id.) However, both of the ALJ's points are faulty.

We have already discussed that, upon remand, the record

must be more fully developed, and that the ALJ will then need to reassess whether Dr. Mitamura's opinions are supported by the complete record. Until the record is complete, the ALJ cannot make a definite determination as to how well Dr. Mitamura's findings are supported by his own examinations since many of the exam reports are still missing. Perhaps more crucially, however, we note that, based on the current record, the ALJ's description in his decision of the evidence was very selective and unfairly framed Dr. Mitamura's medical notes. In his decision, the ALJ juxtaposed the C-4.2 reports in which Dr. Mitamura determined that plaintiff was disabled, with the fact that some of his clinical notes stated that Mr. Cabreja was "neurologically intact with normal motor functioning, reflexes, and sensation." (Id. at 25). While an ALJ is able to discount to some degree the findings of the treating doctor if other information in the record provides substantial evidence justifying skepticism, here the ALJ irresponsibly omitted other information from Dr. Mitamura's notes that supported the doctor's conclusions. For example, during many of the 2012 exams, it was noted that plaintiff had marked tenderness at his lumbar spine, retrolisthesis, spinal instability, and pain in his lower back and down his legs. (Id. at 380, 383, 388). Moreover, the ALJ failed to indicate that Dr. Mitamura only noted Mr. Cabreja's

intact sensation, motor functioning, reflexes and neurology in one exam report, and even then he diagnosed Mr. Cabreja with a disc herniation and degenerative disc disease, along with mentioning the possibility of Mr. Cabreja undergoing revision surgery to further correct his back condition. (Id. at 391-92). Indeed, these C-4.2 reports were accompanied by clinical notes in which Dr. Mitamura made observations, recommendations, and diagnoses regarding Mr. Cabreja's condition. (Id. at 380, 383, 388, 390-91). In short, the C-4.2 reports that indicated that plaintiff was incapable of working were not without support.

The ALJ also explicitly relied on the reports of consultative examiners Drs. Simon and Pelczar-Wissner, supposedly because they were consistent with the medical evidence and with the reports of unidentified "other physicians," and were therefore entitled to "great weight." (Tr. 25). Since Dr. Mitamura's opinion conflicted with the consultants' findings, the ALJ found further reason to give his opinions "little weight." (Id.). However, this weighting decision and comparison were in conflict with the treating-physician rule. Dr. Simon and Dr. Pelczar-Wissner examined plaintiff one time each in 2011 (Id. at 342-45, 371-76), while Dr. Mitamura examined and treated Mr. Cabreja for five years.

See supra pp. 13-24. The Second Circuit has "previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination," Selian, 708 F.3d at 419 (citing Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990)), which is precisely what the ALJ has done here. See also Gonzalez v. Apfel, 113 F. Supp. 2d 580, 589 (S.D.N.Y. 2000). This is because a consulting physician's report gives an impression of the claimant on only one day. Torres v. Bowen, 700 F. Supp. 1306, 1312 (S.D.N.Y. 1988). Therefore it is presumed that in a conflict of views between a treating doctor and a one-time consultant, the conflict should be resolved in favor of the treating physician. Id. Otherwise stated, the opinions of one-time examiners do not overrule those of a treating physician barring any serious errors in the treating physician's opinion, and in this case the ALJ did not identify such errors in his decision.

In sum, the ALJ has disregarded the opinion of a treating physician with a relevant specialization and lengthy doctor-patient treatment relationship, without attempting to fully develop the record and without providing the necessary good reasons to award his views less than controlling weight. Once the Commissioner has sought out additional information to clear

up the discrepancies in his record and gets the missing materials from Dr. Mitamura, she should reconsider whether his evidence is entitled to controlling weight, and if she determines that Dr. Mitamura's opinions are still not entitled to controlling weight, she should provide good reasons for reaching that decision.

### ii. Dr. Liu

The ALJ also gave "little weight" to Dr. Liu, reasoning that the doctor's opinions were unsupported by his own examinations and were inconsistent with those of "other physicians." (Tr. 26) This too was error. Dr. Liu was also Mr. Cabreja's treating physician; he examined Mr. Cabreja over thirty times, on approximately a monthly basis from July 2008 through August 2011 (id. at 275-312), and, as discussed, appears to have continued treating plaintiff well into 2012. Moreover, as a spinal specialist, see supra p. 24 n.54, he was the doctor who performed all of Mr. Cabreja's facet block and epidural injection procedures. Despite their importance, the ALJ ignored these factors in his weighting decision -- as he did with respect to Dr. Mitamura -- thereby depriving his assessment of Dr. Liu of the good reasons needed to discount the opinions of a

long-time, specialized treating physician.

As mentioned, the first reason cited by the ALJ for awarding "little weight" to Dr. Liu was because Dr. Liu's opinion that plaintiff was unable to work was unsubstantiated by the doctor's own clinical examinations. (Tr. 26). According to the ALJ, this was proven by the fact that Mr. Cabreja's "condition progressively improved" since his first examination with Dr. Liu in 2008, the injections relieved pain for up to five months, and his notes reveal negative straight-leg-raising and normal gait. (Id.). This litany of purported deficiencies is inadequate to discount Dr. Liu's opinions.

First, the record is not yet complete. Upon remand, after the record is fully developed and the ALJ gathers additional information to sort out the purported internal inconsistencies and the apparent gaps in Dr. Liu's record, the ALJ will then need to reevaluate whether or not Dr. Liu's opinion is supported by his own examinations. Until then, the ALJ cannot definitively determine that Dr. Liu's opinion was unsupported, as the ALJ failed to seek out any clarification or otherwise attempt to further develop the record.

Moreover, classifying plaintiff's condition as

93

"progressively improved" is simply a misrepresentation of the facts. At his first exam with Dr. Liu in 2008, it was noted that an MRI had just revealed a multi-level disc bulge and that Mr. Cabreja was complaining of lower back pain and lower-extremity radicular symptoms. (Id. at 311-12). As for the most recent exam record from August 2011, five months after his fusion surgery, it was noted that plaintiff's range of motion was "basically nonexistent," and that his lumbar paraspinal muscles were "extremely tender" to palpation, and it was reported that plaintiff had "excruciating" pain if he did not wear his back brace despite the fact that his sensory and motor functions were intact. (Id. at 223). While this last report may be evidence of some tension or inconsistency, it does not prove the progressive improvement that the ALJ suggests when compared to Mr. Cabreja's 2008 exam. This is to say nothing of the records that reflect that Dr. Liu was apparently still administering injections in July 2012 (id. at 383) and that he diagnosed plaintiff with disabling HPN and lumbosacral radiculopathy as recently as June 2012. (Id. at 384-85). When the Commissioner reevaluates the case upon remand, she should reassess Dr. Liu's opinions in light of all the evidence, and if inconsistencies are found, should seek out clarification before making a determination.

94

Additionally, the ALJ erred by implying that Dr. Liu's opinion was not consistent with those of "other physicians." (Id. at 26). The overreaching nature of the ALJ's characterization is reflected in the fact that Dr. Liu's opinion was consistent with those of the two other treating physicians, Dr. Mitamura and Dr. Robbins, both of whom opined on multiple occasions that plaintiff was disabled, just as Dr. Liu did. (E.g., id. at 248, 250, 378-83, 386-92). The fact that two consultants -- Drs. Simon and Pelczar-Wissner -- aligned does not itself justify rejection of the three treating physicians' consistent findings.

With a partially completed record and the misstatements about the record by the ALJ, he erred when he awarded less than "controlling weight" to Dr. Liu. Once the Commissioner fully develops the record and resolves the inconsistencies that were identified by the ALJ in his decision, he should then reevaluate whether or not Dr. Liu is entitled to "controlling weight."

### iii. Dr. Robbins

Dr. Robbins was not awarded "any weight" by the ALJ due to the fact that he did not specifically state any functional

95

restrictions and provided no evidence to support his conclusion that Mr. Cabreja was "totally disabled from work." (Id. at 25-26). However, again, the ALJ's rejection of his findings was plainly unjustified. Dr. Robbins was one of Mr. Cabreja's treating physicians, as proven by his length of his treatment relationship and specialty. Dr. Robbins was a neurology specialist, which was of great relevance to Mr. Cabreja's injury, and Dr. Robbins examined Mr. Cabreja seven times from February 2009 to April 2011.[110] Once again, the ALJ incorrectly disregarded these two factors in his decision not to assign Dr. Robbins's opinion any weight. Nevertheless, the record is incomplete and the ALJ must reevaluate the weight of Dr. Robbins's opinion once the record is fully developed and additional information is sought to resolve any inconsistencies. Until then, it cannot be concluded that Dr. Robbins's opinions were not supported.

## c. The ALJ Erred in Evaluating Plaintiff's Credibility

The SSA regulations require the ALJ to assess the claimant's credibility in a systematic way and to take seriously the claimant's report of subjective symptoms. 20 C.F.R. §

---

[110] This number of exams and the span of time are correct if we include both Dr. Carton's exam reports contained in the records and those missing, but otherwise referenced. See supra pp. 80-81.

404.1529. In doing so, the ALJ exercises discretion over the weight assigned to a claimant's testimony regarding the severity of his pain and other subjectively perceived conditions, and his resulting limitations. See, e.g., Schultz v. Astrue, 2008 WL 728925, *12 (N.D.N.Y. Mar. 18, 2008) (citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979); Snell, 177 F.3d at 135). If the ALJ's findings are supported by substantial evidence, a reviewing court must uphold his decision to discount the claimant's testimony. See Marcus, 615 F.2d at 27 (citing Richardson, 402 U.S. at 401).

Nonetheless, the ALJ's discretion is not unbounded. The Second Circuit has held that throughout the five-step process, "the subjective element of [plaintiff's] pain is an important factor to be considered in determining disability." Mimms v. Heckler, 750 F.2d 180, 185 (2d Cir. 1984); Perez v. Barnhart, 234 F. Supp. 2d 336, 340 (S.D.N.Y. 2002); see also 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3) ("We will also consider descriptions and observations of your limitations from your impairment(s), including limitations that result from your symptoms, such as pain, provided by you, your family, neighbors, friends, or other persons."). In assessing the claimant's testimony, the ALJ must take all pertinent evidence into

consideration. E.g., Perez, 234 F. Supp. 2d at 340-41; see also Snell, 177 F.3d at 135. Even if a claimant's account of subjective pain is unaccompanied by positive clinical findings or other objective medical evidence,[111] it may still serve as the basis for establishing disability as long as the impairment has a medically ascertainable source. See, e.g., Harris v. R.R. Ret. Bd., 948 F.2d 123 (2d Cir. 1991) (citing Gallagher v. Schweiker, 697 F.2d 82, 84-85 (2d Cir. 1983)).

SSA regulations require the ALJ to consider "all of the available evidence" concerning a claimant's complaints of pain when they are accompanied by "medical signs and laboratory findings . . . which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence . . . . , would lead to a conclusion that you are disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a).

---

[111] Objective medical evidence is "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1529(c)(2); see also Casino-Ortiz, 2007 WL 2745704 at *11, n.21 (quoting 20 C.F.R. § 404.1529(c)(2)). Clinical diagnostic techniques include methods showing "residual motion, muscle spasms, sensory deficit or motor disruption." 20 C.F.R. § 404.1529(c)(2); see also 20 C.F.R. § 404.1528(b). Laboratory findings "are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." 20 C.F.R. § 404.1528(c).

An ALJ must apply a two-step process to evaluate a claimant's subjective description of his or her impairment and related symptoms. 20 C.F.R. §§ 404.1529, 416.929; see also SSR 96-7p, 1996 WL 374186, at *6-9 (July 2, 1996) (summarizing framework). "First, the ALJ must consider whether the claimant has a medically determinable impairment which could reasonably be expected to produce the . . . symptoms alleged by the claimant." Martinez, 2009 WL 2168732, at *16 (alteration in original) (citing McCarthy v. Astrue, 2007 WL 4444976, *8 (S.D.N.Y. Dec. 18, 2007)); see also 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1). "Second, the ALJ must 'evaluate the intensity and persistence of those symptoms considering all of the available evidence.'" Peck v. Astrue, 2010 WL 3125950, *4 (E.D.N.Y. Aug. 6, 2010) (citing 20 C.F.R. § 404.1529(c)); accord Meadors v. Astrue, 370 F. App'x 179, 183 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor v. Barnhart, 83 F. App'x 347, 350-51 (2d Cir. 2003)). "To the extent that the claimant's 'pain contentions are not substantiated by the objective medical evidence,' the ALJ must evaluate the claimant's credibility." Peck, 2010 WL 3125950, at *4 (citing 20 C.F.R. § 404.1529(c)); see also Meadors, 370 F. App'x at 183-84 (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii); Taylor, 83 F. App'x at 350-51).

It should be noted that "the second stage of [the] analysis may itself involve two parts." Sanchez v. Astrue, 2010 WL 101501, *14 (S.D.N.Y. Jan. 12, 2010). "First, the ALJ must decide whether objective evidence, on its own, substantiates the extent of the alleged symptoms (as opposed to the question in the first step of whether objective evidence establishes a condition that could 'reasonably be expected' to produce such symptoms)." Id. "Second, if it does not, the ALJ must gauge a claimant's credibility regarding the alleged symptoms by reference to the seven factors listed [in 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3)]." Id. (citing Gittens v. Astrue, 2008 WL 2787723, *5 (S.D.N.Y. June 23, 2008)). If the ALJ does not follow these steps, remand is appropriate. Id. at *15 (citing 20 C.F.R. § 404.1529(c)).

When a claimant reports symptoms more severe than medical evidence alone would suggest, SSA regulations require the reviewing ALJ to consider specific factors in determining the credibility of a claimant's symptoms and their limiting effects. SSR 96-7p, 1996 WL 374186, at *2. These seven factors include: (1) an individual's daily activities; (2) the location, duration, frequency and intensity of pain or other symptoms; (3) factors that precipitate and aggravate those symptoms; (4) the

type, dosage, effectiveness, and side effects of medication that the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, that the individual receives or has received for pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); see also Bush, 94 F.3d at 46 n.4; Wright v. Astrue, 2008 WL 620733, *3 (E.D.N.Y. Mar. 5, 2008) (citing SSR 96-7p).[112]

Finally, "'[o]nly allegations beyond what is substantiated by medical evidence are to be subjected to a credibility analysis . . . [because requiring] plaintiff to fully substantiate [his] symptoms with medical evidence would be both in abrogation of the regulations and against their stated purpose." Martin v. Astrue, 2009 WL 2356118, *10 (S.D.N.Y. July

---

[112] SSR 96-7p states, in pertinent part, "in recognition of the fact that an individual's symptoms can sometimes suggest a greater level of severity of impairment than can be shown by the objective medical evidence alone, 20 C.F.R. sections 404.1529(c) and 416.929(c) describe the kinds of evidence, including the factors below, that the adjudicator must consider in addition to the objective medical evidence when assessing the credibility of an individual's statements."

30, 2009) (citing Castillo v. Apfel, 1999 WL 147748, *7 (S.D.N.Y. Mar. 18, 1999)).

Judged by these standards, we conclude that there are errors in the ALJ's assessment of plaintiff's credibility. First, the ALJ apparently questioned plaintiff's credibility based on "the claimant report[ing] that he has used Hydrocodone on a consistent basis since 2009[,]" while "Dr. Carniciu reported in February 2011 that the claimant uses no current medications." (Tr. 24). According to the ALJ, "if the claimant were suffering from the degree of debility alleged, he would use medication consistently." (Id. at 25). In so framing plaintiff's medication history, the ALJ essentially ignores the fact that plaintiff stopped taking the Hydrocodone in June 2010 because of gastrointestinal side-effects. (See id. at 287). Plaintiff had apparently been hospitalized with "a stomach incident" and was taken off all oral pain medications by Dr. Liu, "to give his stomach a break." (Id.). As clarified by Dr. Robbins in June 2010, plaintiff was "suffering from gastrointestinal bleeding relating to medication." (Id. at 249). Plaintiff was thus off the Hydrocodone from June 2010 until sometime post-lumbar surgery and resumed taking this medication by July 2011. See supra p. 18 n.37. Even so, Dr. Liu explained in July 2011 that

plaintiff "takes hydrocodone for pain only when it is severe but even that makes his heart feel like it is racing." (Id. at 276). At the hearing, plaintiff testified that "I take another medication for the stomach [side-effects]." (Id. at 51).

The ALJ's assumption that a patient's choice to avoid further complications, even at the cost of heightened pain, demonstrates the minimal nature of the pain verges on the absurd. Without knowing the significance of the intestinal or cardiovascular problems that the patient seeks to avoid, there is no basis to compare it with the complained-of pain. In any event, as noted, one of the pertinent criteria in assessing credibility is the side-effects of medication, see 20 C.F.R. § 404.1529(c)(3), and the ALJ turned that fact on its head, essentially using harmful side-effects of a drug as a basis for discounting the claimant's reports of pain.

Moreover, there is evidence -- also ignored by the ALJ -- that despite plaintiff's intermittent use of Hydrocodone, he was prescribed other medications in attempts to treat the pain. On November 5, 2010, Dr. Liu stated that plaintiff "takes some new pain medication, but he does not remember the name," and that plaintiff "was advised to bring his new medication with him when

he comes in next . . . in 4-5 weeks' time." (Tr. 284).
Plaintiff's next appointment with Dr. Liu was on December 1,
2010, at which he received a lumbar facet block injection. (Id.
at 283). No mention was made of plaintiff's other pain
medication. (Id.). Subsequently, in August 2011, Dr. Liu wrote
that plaintiff had been trying some "[o]ther [unspecified] pain
medicines," but that they had "ma[d]e his blood pressure go up
so he is basically limited to taking one Vicodin per day." (Id.
at 223). The record lacks any further information on the matter,
and the ALJ did not attempt to fill this gap, which must be done
on remand. Thereafter, Mr. Cabreja's use of medication should be
reevaluated in light of the full context of plaintiff's medical
history and the complete record.

Second, the ALJ also discounts Mr. Cabreja's credibility in
part because "the claimant acknowledged that he was able to
tolerate a three-hour flight to the Dominican Republic in 2007"
-- a feat that the ALJ implies would not be possible if
plaintiff's subjective complaints were to be believed. (Id. at
24). Although it is not clear from the record when this flight
took place,[113] the ALJ appears to believe that it was in 2007.
(Id. at 24). This was well prior to the manifestation of

---

[113] Plaintiff's testimony only reveals that he flew to the Dominican
Republic some time after the November 2007 accident and before his May 2011
surgery. (Tr. 40-41, 59).

plaintiff's back problems, about which the ALJ acknowledges plaintiff did not even start complaining until July 2008 (id. at 18) and for which plaintiff did not undergo surgery until May 2011. (Id. at 221-22). In any event, the ability to sit for two three-hour flights -- particularly given the compelling reason for the trip -- plainly cannot justify rejecting plaintiff's reports of difficulty sitting for long periods.[114]

The ALJ also discredits plaintiff's subjective claims of pain because plaintiff took and passed his citizenship examination in 2009 and because, at least as of the date of the hearing, plaintiff continued to take weekly walks to an English class. (Id. at 24). As discussed in the medical record overview section, Mr. Cabreja's condition changed over time and was not the same in 2009 -- when he prepared for and took the test -- as it was in 2011 or in 2012. In 2009, diagnosed with a disc herniation, Mr. Cabreja had pain in his lower back and experienced some radicular symptoms (id. at 270) and "d[id] not wish to be considered for surgical intervention" yet. (Id. at 252). Presumably, the ALJ is attempting to discredit plaintiff's allegations of pain via these "daily activities." See 20 C.F.R. § 404.1529(c)(3). Nevertheless, we fail to see how a 2009

---

[114] We note also that on most commercial flights passengers may stand as well as sit for most of the flight.

citizenship exam can discredit Mr. Cabreja's credibility at a post-surgery hearing three years later, let alone how the passage of this exam -- which involved answering ten questions and writing a few sentences (see Tr. 37-38) -- conflicts with plaintiff's representation that he is unable to sit, stand, or walk for extended periods. (See id. at 186-87). Indeed, to the extent that the ALJ is asserting that plaintiff's walk of one block to and from his classes both before and subsequent to this exam reflects an ability to work a full, eight-hour day, we echo other courts that have addressed this issue and note that "[t]here is a big difference, however, between an occasional walk or shopping trip and sitting/standing for an eight hour workday." Molina v. Colvin, 2014 WL 3445335, *15 (S.D.N.Y. July 15, 2014) (citing cases).

Upon remand, once the record is fully developed and the treating-physician rule is properly applied, the Commissioner should also reconsider the evaluation of plaintiff's credibility regarding subjective complaints of pain.

### d. Selective Assessment of the Evidence

Although plaintiff does not make this argument directly, we observe that -- in addition to an example of the selective use

of evidence with respect to Dr. Mitamura, see supra pp. 89-90,
and Dr. Liu, see pp. 93-94 -- the ALJ erred by selectively
assessing other portions of the record as well. Quite plainly,
"[t]he ALJ cannot pick and choose evidence in the record that
supports his conclusions." Cruz v. Barnhart, 343 F. Supp. 2d
218, 224 (S.D.N.Y. 2004) (internal quotation omitted); see also
Vazquez v. Comm'r of Soc. Sec., 2015 WL 4562978, *17 (S.D.N.Y.
July 21, 2015); Callanan v. Astrue, 2011 WL 589906, *4 (E.D.N.Y.
Feb. 10, 2011) (citing Fiorello v. Heckler, 725 F.2d 174, 176
(2d Cir. 1983)); Brown v. Apfel, 1999 WL 144515, *4 (S.D.N.Y.
Mar. 16, 1999) (quoting Valente v. Secretary of HHS, 733 F.2d
1037, 1045 (2d Cir. 1984)). Yet, he has indeed done so here.

We first note that, at the hearing, plaintiff testified
that he specifically could not perform his past machine
operating work because of an inability to "bend over too much
now." (Tr. 49-50). According to plaintiff, "every time that the
machine finishes a piece, a part, you have to go into the
machine, pick it up, then come back out [and] close the
machine." (Id. at 50). This action involved repeatedly bending
at the waist which, plaintiff testified, "would tire his body
down." (Id.). Nevertheless, the ALJ found that plaintiff was not
disabled from his past work (id. at 27) and had the ability to

107

"frequently crouch and stoop." (Id. at 22).

In so finding, the ALJ explained that his RFC determination was supported by Dr. Carton's August 2009 report that, as phrased by the ALJ, stated that plaintiff was capable of "sedentary work." (Id. at 22). Dr. Carton indeed found that plaintiff was capable of "sedentary activity only." (Id. at 253). However, Dr. Carton's full determination was "sedentary activity only with the avoidance of any attempts at lifting, bending, squatting, kneeling, crawling, [and] climbing." (Id.).

More significantly, the ALJ repeatedly emphasized the purported significance of Dr. Pelczar-Wissner's report, assigning her opinions "great weight." (Id. at 25). The ALJ characterized her opinions as determining that plaintiff "has a moderately limited ability to walk and a markedly limited ability to engage in heavy lifting and carrying." (Id. at 22). This is, however, only a paraphrase of Dr. Pelczar-Wissner's ultimate determination -- and something of a shocking one at that. Dr. Pelczar-Wissner actually wrote as follows: "Currently, he has a moderate restriction for walking. Marked restriction for bending, heavy lifting and carrying." (Id. at 344). In utilizing Dr. Pelczar-Wissner's opinions, the ALJ simply skipped

108

over the word "bending," leaving it out of his regurgitation of that doctor's opinions. (See id. at 22).

These selective omissions of clearly relevant evidence of plaintiff's bending restrictions are all the more egregious in light of the ALJ's determination that "claimant's testimony provides a more accurate description of the demands required by his past work." (Id. at 26). When plaintiff's testimony reflected aspects of a job that fit within the ALJ's RFC determination, the ALJ found plaintiff perfectly credible. Yet, when plaintiff's testimony reflected aspects of a job that did not fit quite as neatly within that very same RFC assessment, the ALJ simply ignored that testimony -- along with other evidence, even an opinion from Dr. Pelczar-Wissner who was supposedly accorded "great weight," that similarly contradicts the ALJ's determinations. This was error and on remand, the ALJ must reassess plaintiff's RFC in light of the full record and without this selective utilization of the evidence.

We add one other example of the ALJ's selective assessment of the evidence. As mentioned, the ALJ assigned "no weight" whatsoever to Dr. Robbins's opinions. (Id. at 25-26). He did this, in part, because -- according to the ALJ -- Dr. Robbins

failed to support his ultimate conclusions with evidence and to identify specific functional limitations. (Id. at 26). The ALJ did, however, accord "great weight" to L. Hoffman. (Id. at 20-21). We set aside the reality that, despite the ALJ's characterization of this individual as an "expert[] in psychiatry and [as having] experience as [a] program doctor[]" (id.), there is no evidence to this effect in the record. See supra p. 42 n.81, Instead, we focus on the reality that L. Hoffman's report is nearly as devoid of substance and evidentiary support as a report could possibly be. (See id. at 346-59). He left entire -- seemingly required -- sections blank, and he does not indicate what records he reviewed, if any, or whether he ever met plaintiff in person or otherwise interacted with him. (Id.). As noted, he fails to even fill in dates for the prompt "Assessment is from: __ to current" or check "None" when prompted to opine on plaintiff's functional limitations. (Id. at 346, 356). L. Hoffman indeed checked the box that read "No Medically Determinable Impairment" (id. at 346), and perhaps this determination is entitled to some amount of weight. But for the ALJ to entirely discount a treating doctor's opinions for a lack of support and, simultaneously, grant great weight to a maybe-doctor's single checked box reflects a level of picking and choosing for which we must remand.

e. Incorporation of Non-Severe Impairments

Finally, we observe that the SSA must "consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe.'" 20 C.F.R. § 404.1545(a)(2). Here, the ALJ found that plaintiff's asserted mental impairments (see Tr. 58-59) were not severe. (Id. at 20). The ALJ did, however, find that plaintiff suffered from mild limitations in daily living, social functioning, and concentration, persistence, or pace. (Id. at 21). In a seeming attempt to comply with the requirement that he consider these non-severe impairments, the ALJ wrote that "[i]n making [the RFC] finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be expected as consistent with the objective medical evidence and other evidence." (Id. at 23). Yet, aside from this vague representation, none of the specific non-severe limitations were addressed. Simply writing that he has "considered" that which must be considered obviously does not fulfill the ALJ's obligations under the relevant regulations, statutes, and case law -- an error that must also be corrected on remand.

111

**CONCLUSION**

The ALJ failed in a number of significant ways to fulfill his obligation to evaluate the record and support his finding with substantial evidence. He failed to properly development the record with respect to the records of plaintiff's treating physicians, failed to properly apply the treating-physician rule, failed to properly evaluate plaintiff's credibility, selectively utilized the evidence to support his conclusions, and neglected to properly consider non-severe impairments when determining plaintiff's RFC. Accordingly, we conclude that remand is necessary to determine, in accordance with SSA regulations and case law, whether plaintiff qualifies for disability benefits

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies to be delivered to the chambers of the Honorable Vernon S. Broderick, Room 518, Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York, 10007, and to

112

the chambers of the undersigned, Room 1670, 500 Pearl Street, New York, New York, 10007. Failure to file timely objections may constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. See Thomas v. Arn, 474 U.S. 140, 150 (1985); Small v. Sec'y of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(d).

DATED: **New York, New York**
       **September 14, 2015**

                              **RESPECTFULLY SUBMITTED,**

                              _____
                              **MICHAEL H. DOLINGER**
                              **UNITED STATES MAGISTRATE JUDGE**

Copies of the foregoing Report and Recommendation have been sent this date to:

     Susan D. Baird, Esq.
     U.S. Attorney's Office, SDNY
     One St. Andrew's Plaza
     New York, NY 10007

     Barry I. Weiss, Esq.
     Freedman, Wagner, Tabakman & Weiss
     130 North Main Street
     New City, New York 10956